THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARCHIE PREATTY, Defendant-Appellant.

Second District    No. 2—92—0671

Opinion filed January 25, 1994.

Fred M. Morelli, Jr., of Law Offices of Morelli & Cook, of Aurora, and Vincent C. Argento and Jesse V. Barrientes, both of Law Offices of Vincent C. Argento, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, Lisa A. Hoffman, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

After a jury trial, the defendant, Archie Preatty, was convicted of the unlawful possession of a controlled substance, cocaine, with the intent to deliver (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(a)(1)(A) (now 720 ILCS 570/401(A)(1)(a) (West 1992))) and the unlawful possession of a controlled substance, cocaine, without a controlled substance tax stamp (Ill. Rev. Stat. 1991, ch. 120, par. 2160 (now 35 ILCS 520/10 (West 1992))). The defendant received concurrent prison terms of six years on the former conviction and one year on the latter.

On appeal, the defendant argues that: (1) the evidence did not prove him guilty beyond a reasonable doubt; (2) he was deprived of a fair trial by the State's failure to disclose before trial that its

principal witness had a felony charge pending against him; and (3) the State improperly denied him the potential jurors' arrest records. We reverse and remand.

The State's first witness was Charles Walton, who was a limousine driver at the time of trial but, as of January 25, 1991, was in his eighth year as a uniformed security officer employed by Hawthorne Security. On the evening of January 25, 1991, Walton was assigned to guard Hansen's Motel (Hansen's) on Benton Avenue in Aurora. He had been working there on and off for between a half year and a year, and he was familiar with the layout of Hansen's. Hansen's has a horseshoe-shaped annex with two floors. On the evening of January 25, Hansen's was well illuminated by lights above each of two doorways and by streetlights. Walton was sitting in a car in a driveway directly across the street from the annex and about 100 or 110 yards away.

At about 7:50 p.m., Walton looked through a pair of binoculars and observed the defendant, who was walking alone down the sidewalk toward Hansen's. Although it was "very, very, very cold out," defendant was wearing no gloves. Defendant had nothing in his hands. The defendant went into a room at Hansen's and emerged about six minutes later. When he came out of the room, he was carrying (not wearing) a yellow work glove and was looking over his shoulder. The defendant started walking west on Benton Street. Walton kept observing; he had an unobstructed view of the defendant.

Walton saw the defendant walk across the street and directly to a car that was parked in a parking lot about a half block away from Walton. The defendant approached the driver's side of the car, grabbed the door handle, turned, and went to the passenger's side. The defendant returned to the driver's side, put the glove into his belt, reached down and picked something off the ground, and started "fiddling" with the lock.

At this point, Walton drove his car up to the defendant's car so that the driver's side of Walton's car was next to that of the car by which the defendant was standing. Walton rolled down the window and called out something to the defendant. The defendant turned, saw Walton in uniform, and dropped the glove onto the ground. Walton was about $4^1/_2$ feet from the defendant when the defendant dropped the glove. Walton exited his car and asked the defendant to step away from the other car. He saw that the defendant had a stick in his hand and, apparently, that the defendant had been trying to unlock the car.

Walton picked up the glove. Because the glove felt "sort of packed with something," he looked inside. He observed that in the glove was

a brown paper bag that was open from the top. Inside the bag were numerous small packets containing a white powdery substance. Walton placed the glove on top of the car that the defendant had been trying to enter. He told the defendant that the latter was being held and detained for the Aurora police. He patted down the defendant before placing the defendant into Walton's car. During this pat-down search, Walton found no weapons, no drug paraphernalia, no money, and no key to any hotel room.

Walton did not let the bag out of his sight. Walton called the police department on his car phone. Eventually, Officer James Fanscali arrived. After talking with Walton, Fanscali took the defendant, the glove, and the bag into custody.

According to Walton, the defendant had entered room 32 on the first floor of Hansen's annex. Walton acknowledged that, had the door been locked, the defendant would have needed a key to enter, unless the lock was broken. He had no idea whether the door was locked on the evening of January 25, 1991. He did not investigate whether the lock was broken, although the police later did so. Walton was present when the police searched room 32, but he did not enter the room, and he had no further involvement in the case other than giving his testimony at trial.

On cross-examination, Walton testified that, while he worked for Hawthorne Security, he made about 575 detentions for arrest. He had worked "hand in glove" with the police. Walton had never applied to be a police officer. He was with the Kane County sheriff's police "for awhile" as an auxiliary, but he decided that it "wasn't [his] thing." He had also undergone some police training, principally 40 hours of training with the State Police. This training included regular police courses on detaining individuals, gun safety, and courtroom procedure.

Aurora patrol officer James Fanscali testified that, at about 8:30 p.m. on January 25, 1991, he was dispatched to Hansen's. The parking lot was well lighted, and, upon arriving, Fanscali could see that Walton was standing next to the defendant. Walton was holding a yellow cloth work glove. Walton explained that he had gone to the defendant and the car to investigate. Fanscali took the glove from Walton. Inside the glove was a paper bag, and inside the bag was a plastic baggie. Inside the baggie were numerous small packets, each of which was wrapped with a twist tie. Each small packet contained a white powdery substance. Fanscali field tested one of the small packets and concluded that it contained cocaine. He observed that neither the paper bag nor the baggie or any of the small containers had a Department of Revenue controlled substance tax stamp or the

equivalent. At trial, Fanscali identified one State exhibit as the yellow glove that Walton had handed him. He identified other exhibits as the paper bag and the plastic containers that had been inside the glove.

After he examined the glove at the parking lot, Fanscali arrested the defendant. He searched the defendant at the scene and found no weapons; he could not recall at trial whether the defendant was carrying any keys. Fanscali did not perform the more thorough booking search at the police station. After the defendant was in custody, Fanscali and another officer asked for the defendant's consent to a search of room 32. The defendant signed a consent form. When Fanscali returned to Hansen's to search the room, he contacted Walton, who used a key to unlock the door to room 32. The police searched the room for about two hours. Nobody else was inside. The police found no drugs, no drug paraphernalia, no weapons, no keys to the room, and no glove to match the one that Walton had shown to Fanscali.

The State called Janet Girten, a forensic scientist with the Illinois State Police crime laboratory. Girten testified that she weighed and tested the contents of 54 of the small containers that had been inside the baggie in the yellow glove. The net weight of the powder in these bags was 15.17 grams. There were 18 more bags that Girten did not weigh; she extrapolated that the remaining bags had a gross weight of 6.45 grams. The powder in each of the 54 bags that Girten examined tested positive for cocaine.

Douglas Needham of the Aurora police department testified as a State expert in the area of narcotics trafficking and distribution. From his investigative experience, he was able to state that at the lowest street level, powder cocaine is most commonly sold in quarter-gram units for $25 apiece, the same price as in January 1991. Fourteen grams of cocaine, purchased in separate quarter-gram units, would cost about $1,400. However, the same amount purchased in a single unit would cost about half as much, or $700. Needham opined that a person who carried around 72 separate quarter-gram packets of cocaine would be doing so for distribution for profit, rather than for his own personal use. The time and expense involved in packaging the cocaine would be worthwhile if the drug could be sold in small units.

Needham stated that the presence or absence of drug parapher-nalia (such as cutting agents, plates, mirrors, grinders, or baggies) would be relevant to his opinion of whether a person was involved in distributing cocaine. However, not all traffickers possessed any or all of these items. Moreover, at times a street dealer would have no

money on his person. These times included whenever the dealer had just bought the cocaine or whenever the dealer was just getting ready to sell it. Officer Needham conceded that Aurora has "no shortage of cocaine." However, he had never walked down a street and noticed a packet of cocaine lying on the ground.

Defendant's first witness was Officer Fanscali. Fanscali recalled that after the arrest, the defendant waived his *Miranda* rights and told Officers Parks and Fanscali that he had rented a room at Hansen's two days earlier. He told them that when he went to Hansen's on the evening of January 25, 1991, he knocked on the door to room 32 because he had not taken his key with him. He expected his girlfriend, Alice Johnson, to be in the room and to let him in. When nobody answered his knock on the door, the defendant assumed that Johnson was not there, and he returned to his car. Shortly afterward, Walton stopped him.

Officer Fanscali was familiar with Hansen's. He stated that one entered room 32 directly, without stepping through a foyer. Fanscali testified that he witnessed Officer Parks search room 32 about two hours after defendant was arrested. Only the police were in the room at the time, but it appeared that recently others had been there.

Alice Johnson testified next. She had lived in Aurora 17 years and was familiar with Hansen's, where she had stayed many times. On January 25, 1991, she first saw the defendant at her mother's house. He gave her a key to room 32 and told her he would see her later that day at Hansen's. However, Johnson never went to the room. To her knowledge, she was the only person who had a key to room 32 that day. However, she did not register for the room, so she could not say whether the defendant had two keys to the room. She acknowledged that, usually, anyone who registers at Hansen's can get a second key to his room.

On January 26, 1991, Johnson learned of the defendant's arrest. She did not talk to the police. Until the defendant's attorney interviewed her in preparation for the trial, Johnson had told nobody that she had the key to room 32 on January 25, 1991. Having visited the area where the defendant was arrested, Johnson admitted that from where Walton had parked, one could see room 32 quite clearly, especially with binoculars.

The defendant testified last. A couple of days before his arrest, he rented room 32 at Hansen's, so that he could be with Alice Johnson. When he rented the room, he received only one key. Early on January 25, 1991, he gave Johnson the key and told her to meet him at Hansen's at about 8 p.m. The defendant went to room 32 and knocked twice on the door. Receiving no answer, he concluded nobody was in

the room. The door was locked, so he returned to where he had parked his car.

The car's front door latch was broken, so the defendant used a stick he carried to open the door. As he did so, Walton drove up, approached him with a gun drawn, and told the defendant to get up against the defendant's car. The defendant complied. Walton patted down the defendant and told him to go to the front of the car. Defendant acquiesced and stayed at the front of the car about 20 minutes as Walton searched him. Walton went back to his own car, made a phone call, and received another call.

Walton returned to the defendant's car. As he did so, he bent down under the car. When he stood back up, he was holding a glove. He asked if the glove belonged to the defendant. When the defendant replied it did not, Walton went back to his own car and called the police, who soon took the defendant into custody. The defendant testified that his car's headlights were on when he parked near Hansen's. However, when he parked his car, he did not notice any glove in the area.

The defendant testified that he had never owned the yellow glove and that he had never seen the glove until Walton picked it up off the ground. The defendant stated that he never owned the drugs or containers that were admitted into evidence. When he was arrested, he had no key to the motel room and he owned no scales, grinders, baggies, cellular phones, or other drug equipment or paraphernalia. On January 25, 1991, the defendant did not possess any controlled substances whatsoever.

On cross-examination, the defendant stated that, on January 25, 1991, he was living at the apartment of Rose Bailey, a lady friend of his. The defendant paid $32 per night to rent the room at Hansen's, where he had stayed a few times before. Originally, he planned to rent room 32 for only one night, January 24, to share the room with Georgia Courtney. At noon on January 25, he turned the key in but immediately rerented the room, thinking he might spend another night there with Courtney. However, later that day he met Johnson, and they agreed to spend the night together in room 32.

In his closing argument, the prosecutor asserted that it was implausible that there had happened to be 72 bags of cocaine lying in the parking lot when the defendant drove there. Also, he asserted that although the defendant's attorney had claimed in his opening statement that Walton's desire to be a policeman made him unreliable, no evidence of such a motive came out at trial.

The defendant's counsel conceded that the yellow glove containing cocaine had been in the parking lot on the evening of January 25,

1991. However, he asserted, Walton's testimony was the only direct evidence that the defendant and not someone else had dropped the glove onto the ground. The defendant's attorney argued that Walton's desire to play policeman meant Walton was not credible, even if it turned out that Walton had never become a police officer. The defendant's attorney stressed the evidence that the defendant lacked a key to room 32 and that the police needed a key to unlock the door when they searched the room. Also, according to defense counsel, the State's assertion that the defendant was trafficking in drugs was undercut by the lack of any evidence of drug paraphernalia or money either in the room or on the defendant's person.

In rebuttal, the prosecutor noted specifically that the defendant did not deny that a glove filled with cocaine was found near the defendant and his car. He emphasized that even though no key was found in the defendant's possession, there was a reasonable inference that somebody was in room 32 and let him in. The prosecutor also asserted that since anyone in room 32 could see the defendant's arrest, it was not surprising that neither any person nor any drug paraphernalia was found in a search of the room two hours after the defendant's arrest.

After the court entered judgments of conviction on the jury's guilty verdicts, the defendant moved for a new trial. He asserted, in part, that despite his timely pretrial discovery motion, the State had not disclosed that Charles Walton faced a pending Kane County felony charge for acting as a private investigator without a license. He also asserted that the defense was not informed that at the time of Walton's testimony, Walton was on "pre-trial diversion," a program that defendants may be allowed to enter only at the State's Attorney's pleasure, and that had the defense been aware of Walton's status and of the reason for that status, it would have had "fertile ground for cross-examination."

The defendant's attorney, Fred Morelli, asserted that he became aware of the pending charge against Walton only after the jury started deliberating. Morelli argued that because Walton's credibility was crucial to the defendant's theory of the case, the failure to disclose the pending charge prejudiced the defendant. Attorney Morelli filed an affidavit with the motion, stating that he had been informed that Assistant State's Attorney Joseph Rago was going to testify that Rago had told Morelli orally that charges were pending against Walton. Morelli stated that he had no recollection of any such conversation and that his file contained no notes of any such conversation. Morelli also stated that he was unable to admit or deny that this conversation took place and that had he been informed of the pending

charges, it would have significantly affected his cross-examination of Walton.

The court held a hearing on the motion. Rago testified that he had been assigned to the case and that he indicated to each of the defendant's three successive attorneys that the case had been set for trial. On December 16, 1991, as the parties set a trial date before Judge Thomas Hogan, Rago spoke with Morelli. According to his testimony, on that day, Rago told Morelli that he had just learned from witness Walton that Walton "had a charge pending against him, being unlicensed security guard, whatever that is." Rago recalled that he and Morelli discussed the pending charge. Rago told Morelli that he thought Walton's charge was irrelevant because there was no conviction. He also stated that he had told defense counsel that he had made clear to Mr. Walton that "there was no deal or any agreement between Walton and the State's Attorney's Office for his testimony."

Also at the hearing, another assistant State's Attorney referred to pretrial diversion, noted that there was no evidence that the State had made a deal with Mr. Walton for his testimony, and in an apparent reference to Mr. Walton's pretrial diversion status at the time of his testimony, asserted that because there was no deal with Mr. Walton in exchange for his testimony, the State was not obliged to provide "that information as to whether or not it was a deal."

Rago further testified that upon being told about Walton's situation, Morelli disputed Rago's assertion that the pending charge was irrelevant. Rago responded that they could argue about it later; he had a duty to tell Morelli what he had just learned. Morelli acknowledged to Rago that Rago had fulfilled his duty to disclose the information. The case did not go to trial on December 16, 1991, but was continued to March 9, 1992, shortly before which another assistant State's Attorney took the case.

After hearing the testimony and the argument, the trial judge stated that he did not question Rago's veracity. However, the judge added that it was also very difficult to believe that had Morelli been told the information at issue, he would have made no note of it. The judge observed that the defense was able to cross-examine Walton at length about Walton's alleged desire to "play cop." Thus, the trial judge concluded:

> "I can't in all good conscience find that had the jury known of this charge and the disposition, that they would have rendered any different verdict, although I think it's a very close call. Nor can I find that the violation by the State is so egregious that the extraordinary remedy of granting a motion to dismiss would be appropriate. And I certainly can't find the defendant not guilty."

The court denied the defendant's motion. The defendant was sentenced as we have indicated, and he timely appealed.

We first consider the defendant's argument that he was not proved guilty beyond a reasonable doubt of any offenses. The defendant argues, somewhat perfunctorily, that had he possessed controlled substances, (1) he would not have cooperated with the police and (2) a search of room 32 would have revealed evidence of drug trafficking. The defendant also asserts that the evidence shows that he could not have entered room 32 on the evening of January 25, 1991.

The defendant's argument is without merit. When reviewing a challenge to the sufficiency of the evidence, this court is not to reweigh the evidence, redetermine the credibility of the witnesses, or otherwise invade the prerogatives of the fact finder. (*People v. Campbell* (1992), 146 Ill. 2d 363, 375; *People v. Cosme* (1993), 247 Ill. App. 3d 420, 428.) Our inquiry is limited to determining whether all the evidence, when viewed in the light most favorable to the prosecution, is sufficient to convince any rational trier of fact that the elements of the offense have been proved beyond a reasonable doubt. *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

■ We conclude that there was ample evidence, both direct and circumstantial, to convict the defendant.

■ We next consider the defendant's argument that the State improperly denied him a list of prospective jurors' "rap sheets." The defendant cites no relevant authority to establish either that he was entitled to these materials or that his failure to receive them prejudiced him in any way. We conclude that the argument is waived. See 134 Ill. 2d R. 341(e)(7).

We turn finally to the defendant's principal contention on appeal: that the State failed to inform him in due time that the principal State witness, Charles Walton, was facing a felony charge at the time of the trial. The defendant argues that such information was potentially exculpatory because it could be used to impeach or discredit Walton's testimony and that the State's failure to disclose the information unfairly deprived him of the opportunity to apprise the jury of this weakness in the State's evidence. The defendant also argues that had he been informed before his trial that Mr. Walton had been placed on pretrial diversion, whereby persons deemed qualified by the State's Attorney's office and approved by the local police are permitted to plead guilty, to not receive a conviction, and to be placed on the equivalent of probation with the case being dismissed at the conclusion of the "probation" period, that material would have provided an important basis for cross-examination of Mr.

Walton. He emphasizes Walton's admission of guilt, coupled with his continuing need for approval of the State's Attorney's office.

The record does not definitively reflect that the trial judge actually found that the State failed to disclose the pending charge against the witness Walton to defendant's counsel. The portions of the record that we have quoted are susceptible to opposing interpretations; indeed, the State argues on appeal that the judge believed Rago's testimony and that he concluded that there was timely disclosure. However, the trial judge also seems to have proceeded as if there had been a discovery violation, and his statement that he did not question Mr. Rago's veracity may have been meant to state only that the court accepted that the assistant State's Attorney honestly believed—whether accurately or not—that the information had been disclosed. For purposes of this appeal, however, we need not focus on the court's finding on the disclosure of the charge pending against Mr. Walton. Rather, we emphasize the record's demonstration that the State did not timely disclose Walton's placement on pretrial diversion.

Both due process and Illinois Supreme Court Rule 412(c) obligate the State to disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged. (134 Ill. 2d R. 412(c); *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; *People v. Ward* (1992), 154 Ill. 2d 272, 297-98.) A violation of this rule does not require a new trial unless the defendant demonstrates that the undisclosed information was "material," *i.e.*, there is a probability sufficient to undermine confidence in the outcome such that, had the information been disclosed, the verdict would have been different. *United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383; *People v. Dugan* (1992), 237 Ill. App. 3d 688, 692-93.

In some circumstances, the fact that Walton was facing a felony charge at the time of the trial could be the type of information that could form the basis of a violation of *Brady* and of Rule 412(c). Information that may tend to cast doubt on a State witness' credibility (such as pending charges that may reasonably be expected to affect the witness' motivation to testify in certain ways) "tends to negate the guilt of the accused." (134 Ill. 2d R. 412(c); *Bagley*, 487 U.S. at 676, 87 L. Ed. 2d at 490, 105 S. Ct. at 3380; *People v. Godina* (1991), 223 Ill. App. 3d 205, 210-11.) However, under the circumstances of this case, we rely on the State's failure to disclose that its witness was on pretrial diversion.

Whether an omission is material must be determined in the

context of the entire record, and a court of review may consider both the closeness of the evidence and the adverse effect that nondisclosure may have had on the preparation or presentation of the defendant's case. (*Bagley*, 473 U.S. at 683, 87 L. Ed. 2d at 494, 105 S. Ct. at 3384; *Dugan*, 237 Ill. App. 3d at 693; *People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 254.) Even though he has never disputed that there was a glove full of cocaine underneath his car and that Walton discovered and preserved this evidence, the defendant has consistently denied that the glove was his and that he had ever seen the glove before.

■ We agree with the defendant that this case was essentially a credibility contest between himself and Walton. Further, as defense counsel noted in the post-trial hearing, the jury deliberated 6½ hours on what was a relatively simple fact situation. Considering the simple contest here between the defendant's and Walton's credibility, we find that the State's failure to timely disclose Walton's pretrial diversion status, and his resulting possible motive to alter his testimony, undermines confidence in the outcome. (See *Bagley*, 473 U.S. at 683, 87 L. Ed. 2d at 494-95, 105 S. Ct. at 3384; *Dugan*, 237 Ill. App. 3d at 693; *Gutirrez*, 205 Ill. App. 3d at 254.) Based on the State's material omission, we reverse the defendant's conviction and remand the cause for retrial.

The judgment of the circuit court of Kane County is reversed and the cause is remanded.

Reversed and remanded.

McLAREN and DOYLE, JJ., concur.