THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BROSHEA SHARROD, Defendant-Appellant.

First District (5th Division)   No. 1—93—1064

Opinion filed April 7, 1995.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Broshea Sharrod was found guilty of armed robbery and aggravated discharge of a firearm. Defendant was sentenced to eight years for the robbery conviction and eight years for the aggravated discharge of a firearm conviction, the sentences to run concurrently. Defendant appeals and we reverse and remand.

Anton Johnson testified at trial that on December 15, 1991, he was 17 years old and lived at 832 East 17th Street. On that date at about 7 p.m., Anton was with his cousin Vince listening to music in a car parked in a lot on 17th Street, about 50 feet from Anton's home. Vince left the car and went inside Anton's house. Anton remained in the car, sitting in the front passenger seat. Anton testified that a few minutes later, defendant, Jacoby Adams, Carvelle Simpson, Herman Fulwiley and someone named J.R. approached the car. Anton knew defendant from the neighborhood and had seen him hundreds of times in the past. J.R. knocked on the passenger window and asked Anton to step out of the car. Anton exited the car, and J.R. asked Anton if he was a G.D., which Anton understood to mean Gangster

Disciple. Anton responded that he was not a G.D. J.R. also asked Anton whether his father was a drug dealer and stated that Anton's father was making too much money. J.R. then hit Anton in the face, and J.R. and the other boys started pulling on Anton. Adams pulled out a shotgun and put it to Anton's head. Defendant then reached into Anton's pockets, took $125 from one of Anton's pockets, and put it in his own pocket. Defendant then hit Anton in the face. Anton testified that his mother had given him the $125 the day before for Christmas shopping. Anton had not yet spent the money because he was showing it off. Neither Anton nor his parents were employed at the time.

Defendant and J.R. then grabbed Anton by the back of his jacket and walked him to his house. Adams was at Anton's side with the gun to his head. Anton saw 30 or 40 people watching, but none of them came to help him. Anton saw defendant's brother Henry Jimerson in the back of the crowd and heard him yell "kill him." As they approached Anton's house, Anton's brother William Johnson and Anton's father came outside. Anton's father pushed the gun away, grabbed Anton, and pushed him toward the porch.

Defendant and J.R. grabbed Anton again. Adams was playing with the trigger of the gun, trying to shoot it. At that point, Anton's mother, Verncil Johnson, came outside. She grabbed Anton and pushed him toward the house. Adams put the gun to Verncil's head. Anton proceeded to go into the house. Anton's father pulled Verncil into the house and Verncil told William to call the police.

Verncil was trying to close the door, but the shotgun was pushed inside the door to the house. She was eventually able to close the door. Anton then heard a loud noise near the door. The noise sounded like a gunshot. Anton's mother opened the door, and Anton saw that the screen door was bent and there was a hole in the steel door. Anton never saw anyone fire a shot and never saw anyone other than Adams holding the gun.

William Johnson testified that he was at home on December 15, 1991, when at approximately 7:10 p.m., his cousin told him that defendant and his friends had jumped on Anton. William went outside and saw that defendant and J.R. had Anton by the back of the collar and Adams had a gun to Anton's head. William's father then came outside.

William saw defendant strike Anton. His father tried to grab Anton and pull him away. William then saw his mother Verncil come outside. Defendant was trying to block Verncil from getting to Anton. Verncil was trying to push Anton into the house. Adams put a gun to Verncil's head. Verncil said "don't shoot me" and Williams

heard defendant's brother Henry Jimerson say "shoot her, shoot her, kill the bitch, kill her."

William went into the house, and Verncil pushed Anton into the house. After the door was shut, William heard two loud booms. William called the police and then noticed that the door had bullet holes in it. William testified that on December 14, 1991, his mother gave both William and Anton $125 for Christmas shopping. There were six children living at home, but only William and Anton were given money.

Verncil Johnson testified that at approximately 7:10 p.m. on December 15, 1991, her nephew ran into the house and told her that defendant was beating up Anton. Her husband went outside and she soon followed. She saw defendant, whom she knew from around the neighborhood and had seen hundreds of times. Adams had a shotgun to Anton's head. She pushed Anton toward the door to their house. Adams put the gun to Verncil's head and she heard defendant's brother say, "Kill her, kill her." Verncil's husband pulled Anton into the house. She was trying to get to the door when her husband pulled her inside. Verncil tried to close the door but the shotgun was put inside the door. She heard two loud booms at the door seconds after she was able to close the door. She never saw anyone fire the gun. Verncil testified that she gave one of her sons $125 on December 14, 1991, for Christmas shopping. It was money she had received from her public aid check.

Officer Berry, a Ford Heights police officer, testified that he responded to a call of "shots fired." Officer Berry saw holes in the door of the Johnsons' home. It appeared to him that a shotgun had been fired at the door. Officer Berry spoke with Anton and noticed that the side of Anton's face was bright red. Anton told Officer Berry that defendant was one of the offenders.

Defendant's brother Henry Jimerson testified on behalf of defendant that at approximately 7 p.m. on December 15, 1991, he was in the front of the parking lot on 17th Street with defendant, Carvelle Simpson, Tyrone Simpson and someone named Herman. Jimerson saw Adams and a person named J.R. walk up to the car Anton was in, pull him out of the car and start hitting him. Jimerson testified that he saw J.R. slap Anton several times and heard Anton being asked where the dope and the money were. Anton responded that they were in the cornfield. Jimerson testified that he was 50 feet away from the car that Anton was in, but he heard the conversation. Adams and J.R. proceeded to drag Anton toward his mother's house. Jimerson testified that he saw Anton's father come out of the house. Anton's father grabbed Anton and tried to pull him into the house.

Anton's mother also came out of the house. Jimerson saw Adams put the shotgun to Anton's mother's head. Eventually Anton and his parents went back into the house and closed the door. Jimerson testified that at that point he and defendant started to run away and he heard two gunshots. Jimerson stated that he and defendant were not involved in these crimes.

The jury found defendant guilty of armed robbery and aggravated discharge of a firearm. Defendant was sentenced to two concurrent eight-year terms. Defendant appeals, claiming that: (1) the State erred when it failed to disclose the fact that when Anton Johnson first accused defendant of involvement in this crime, Anton was on supervision for possession of a controlled substance; (2) the trial court improperly prevented defendant from presenting an eyewitness disclosed the day trial began; and (3) the trial court improperly limited defendant's cross-examination of the victim.

■ Defendant first claims that he was denied his due process right to a fair trial because the State withheld information in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The Supreme Court in *Brady* held that due process requires the State to disclose to the defense, upon request, all evidence which could tend to negate the guilt of the accused. The *Brady* rule has been codified in Illinois by Supreme Court Rule 412(c). (134 Ill. 2d R. 412(c).) Rule 412(c) requires the State to disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged. (134 Ill. 2d R. 412(c).) Information that may cast doubt on the credibility of a State witness tends to negate the guilt of the accused and must be disclosed. (*People v. Preatty* (1994), 256 Ill. App. 3d 579, 627 N.E.2d 1199.) Among the information which the State must disclose is evidence with potential impeachment value such as prior convictions, probationary status, pending criminal charges, and juvenile adjudications. *People v. Redmond* (1986), 146 Ill. App. 3d 259, 496 N.E.2d 1041.

In its answer to defendant's discovery request, the State named Anton Johnson as a witness but asserted that, "The People are unaware of any evidence of witnesses [*sic*] which may be favorable to the defense in this case." The State failed to reveal that Anton was on juvenile supervision for possession of a controlled substance at the time he first named defendant as a participant in the crime. In denying defendant's motion for a new trial on the basis of this nondisclosure, the trial court relied on Supreme Court Rule 412(a)(vi), which provides that the State must disclose to defense counsel "any record of prior criminal convictions, which may be used for impeachment, of

persons whom the State intends to call as witnesses at the hearing or trial." (134 Ill. 2d R. 412(a)(vi).) The trial court noted that since a juvenile adjudication is not a criminal conviction, the State was not required to disclose such information under Supreme Court Rule 412(a)(vi). The trial court's decision is faulty, however, since it is not Rule 412(a)(vi), but rather Rule 412(c) and the right to due process, as expressed in *Brady*, which required the State to turn over the information of the alleged victim's probationary status. See *People v. Preatty* (1994), 256 Ill. App. 3d 579, 627 N.E.2d 1199 (the State's failure to disclose that key witness was on pretrial diversion status violated due process).

Cross-examination into a witness' motive or bias is different from impeachment by prior conviction. As the court explained in *Davis v. Alaska* (1974), 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353-54, 94 S. Ct. 1105, 1110, quoting 3A J. Wigmore, Evidence § 940, at 775 (Chadbourne rev. ed. 1970):

> "One way of discrediting the witness is to introduce evidence of a prior conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues of personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' "

The State contends that information on Anton's juvenile supervision would not have been impeaching since Anton was no longer on supervision at the time of trial. Anton's juvenile record reveals that on October 11, 1991, the State filed a petition against him for adjudication of wardship, charging Anton with possession of a controlled substance. On November 26, 1991, the court entered an order of one year of supervision. The supervision was terminated on November 23, 1992, nearly three weeks before trial began.

When the instant offense occurred on December 15, 1991, Anton had been on supervision for three weeks. It was on that date that Anton first told the police that defendant was involved in the offense.

■ Evidence that a witness first accused the defendant at a time when the witness was on juvenile probation can be explored by the defense on cross-examination to explore bias of the witness. In *Davis*,

the defense sought to impeach a State witness with evidence that at the time he made an out-of-court identification of the defendant as the offender, he was on probation for a juvenile offense. The Supreme Court found that such cross-examination was permissible since the witness' probationary status may have influenced him to wrongly identify someone as the offender in the hope that he would receive some favorable treatment by the State. The Court noted that the faulty initial identification could then have affected the witness' later in-court identification of the defendant.

The State attempts to distinguish *Davis* on the basis that the defendant in *Davis* was restricted by the court from cross-examining the witness regarding his juvenile probation, whereas in the instant case, there was no "direct restriction of cross-examination" and the defense "was free to cross-examine the witness on any relevant subject." Defendant, however, could not cross-examine Anton on his juvenile supervision since the State failed to disclose this information.

Furthermore, the State emphasizes the fact that in the instant case, unlike in *Davis*, the witness was no longer on supervision by the time of trial. The State asserts that Anton's supervision status at the time he identified defendant had no effect on his later testimony because Anton had successfully completed supervision and could no longer have hoped for any leniency from the State. The State's argument is unpersuasive, however, since *Davis* clearly found that it was the witness' probationary status at the time he initially identified the defendant which went to motive and bias and that bias could have affected the in-court identification. At the time when Anton first accused defendant, Anton had a motive to gain favor with the State. At any time during the next year, the State could have filed a petition against Anton for violation of supervision, which could have led to an adjudication of delinquency and possible incarceration. Whether Anton hoped for or expected leniency from the State at the time he first accused defendant is a proper area of inquiry on cross-examination. Anton's possible bias or motive at the time he initially accused defendant of the crime did not simply disappear because the witness was no longer on probation at the time of trial. Furthermore, a faulty initial identification could lead to a faulty in-court identification.

We therefore find that the State should have disclosed the fact that Anton was on supervision at the time he initially identified defendant since the defense was entitled to cross-examine Anton regarding any hope or expectation for leniency in connection with the supervision disposition. For this reason, we reverse defendant's conviction and remand for a new trial.

In light of our decision to reverse and remand, we need not and do not address defendant's contention that he was denied his fundamental right to present witnesses when the court prevented defense witness Deloris Peden from testifying as a sanction for tardy disclosure of this witness to the State. Defendant's last contention may, however, arise on remand. We therefore address this issue of whether defendant was denied his fundamental right to cross-examine the alleged victim regarding where he obtained the money taken from him during the armed robbery.

After asking Anton about the $125 in his pocket, defense counsel asked Anton whether either his mother or father worked. When Anton responded that they did not, defense counsel asked Anton "How do they support themselves?" The State objected and defense counsel explained to the court at sidebar that he wanted to show that Anton's parents had not yet received their monthly public aid check and it was therefore improbable that Anton's parents gave him $125. Defense counsel was also apparently interested in eliciting testimony that Anton's father was a drug dealer. The court stated that the improbability of Anton having such an amount of money was an issue for the jury to decide, but sustained the State's objection on relevancy grounds.

The trial court is given substantial discretion to determine the manner and scope of cross-examination. (*People v. Dortch* (1982), 109 Ill. App. 3d 761, 441 N.E.2d 100.) The trial court's decision regarding the scope of cross-examination will not be reversed absent an abuse of discretion resulting in prejudice to defendant. *People v. Sandoval* (1990), 135 Ill. 2d 159, 552 N.E.2d 726.

■ We do not believe that the trial court abused its discretion in preventing defense counsel from asking Anton where the $125 came from. Defense counsel had sufficient opportunity to raise before the jury the issue of whether Anton could actually have had $125 in his possession. Defense counsel elicited from Anton the fact that not only was Anton unemployed at the time of the incident, but also that Anton's parents were unemployed at that time. Defense counsel also elicited testimony from Anton's brother William that although Anton and William each received $125 from their mother in order to purchase Christmas presents, none of the parents' remaining seven children, four of whom still lived at home, received any money. Furthermore, Anton's mother testified that she only gave one of her sons $125. This information was sufficient for defense counsel to raise an issue as to whether Anton was in fact in possession of $125.

Defense counsel also had the opportunity to raise before the jury the allegation that Anton's father was a drug dealer when counsel

692

elicited on cross-examination of Anton the fact that J.R. had asked Anton about his father's drug dealing. There was no error in preventing defense counsel from pursuing this subject further. Where Anton or his parents obtained the $125 has no relevance to the issue of whether defendant committed an armed robbery.

Accordingly, we reverse defendant's convictions for armed robbery and aggravated discharge of a firearm and remand for a new trial.

Reversed and remanded.

COUSINS, P.J., and T. O'BRIEN, J., concur.