# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Simon*, 2011 IL App (1st) 091197

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAMON SIMON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-1197 |
| Filed | May 27, 2011 |
| Rehearing denied | August 25, 2011 |
| Modified opinion filed | August 26, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder was affirmed, despite his arguments that he acted with actual, though unreasonable, belief in self-defense that required reduction of the conviction to second degree murder, that the trial court erred in barring evidence supporting his theory of self-defense, that the trial court relied on the erroneous recollection of certain testimony, and that State failed to disclose one witness's felony conviction and allowed the witness to provide perjured testimony concerning his criminal history, since the fact finder could have found that defendant failed to prove he unreasonably believed he was acting in self-defense, the trial court's exclusion of the evidence of the victim's violent acts against defendant was not abuse of discretion, appellate court refused to find the trial court improperly recalled the testimony of one witness, and there was other testimony supporting trial court's decision. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-20692; the Hon. Frank Zelezinski, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and John Koltse, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Presiding Justice Garcia and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a bench trial, defendant Damon Simon was convicted of first degree murder for the shooting death of Robert Hill. Defendant filed a motion for a new trial, which was denied, and after hearing aggravation and mitigation, the trial court sentenced defendant to 50 years in the Illinois Department of Corrections. On appeal,[1] defendant argues that his conviction should be reduced to second degree murder and remanded for resentencing because he acted with an actual, though unreasonable, belief in self-defense. Alternatively, defendant claims that he is entitled to a new trial because: (1) the trial court erred in barring evidence that supported defendant's theory of self-defense, (2) the trial court relied on an erroneous recollection of the evidence in weighing witness credibility, and (3) the State failed to disclose a witness's felony conviction and allowed the witness to provide perjured testimony when it failed to correct the witness's misstatement of his criminal history. We affirm.

¶ 2                                    BACKGROUND
¶ 3     On August 14, 2006, defendant was arrested and subsequently indicted for first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) for the shooting death of Robert Hill (the victim). In his answer to the State's motion for pretrial discovery, defendant stated that he would assert the affirmative defense of self-defense. Defendant waived a jury trial and

---

[1]Defendant also filed a separate appeal regarding the dismissal of his *pro se* postconviction petition, which we consider in No. 1-09-2199.

proceeded with a bench trial on November 12, 2008.[2]

¶ 4      The State called Aaron Jackson as a witness, who testified that he was present in the parking lot at Corona's Food Mart in Calumet Park at approximately 1 p.m. on July 21, 2006, attempting to purchase marijuana. He observed defendant in the passenger seat of a vehicle in the parking lot, and another individual was in the driver's seat. Jackson approached the vehicle and asked defendant whether he had any marijuana. Defendant responded that he did and turned to reach behind his seat. Defendant then turned around quickly to face forward, left the vehicle, and told Jackson to move out of the way. Jackson observed that defendant appeared surprised when he turned to face forward, and he observed defendant remove a gun from his waistband.

¶ 5      When defendant left the vehicle, Jackson observed the victim approaching from behind Jackson, riding a bicycle in the direction of the vehicle. Jackson was familiar with the victim, as both Jackson and defendant were members of the Black P Stones gang and the victim was a member of the Gangster Disciples gang. Since the victim was behind him when Jackson was speaking to defendant in the automobile, Jackson was unable to observe the victim while he was approaching. Jackson did not observe any other people approaching defendant's vehicle with the victim. When Jackson first noticed the victim, the victim was approximately 8 to 10 feet from defendant. Both of the victim's hands were gripping the bicycle's handlebars.

¶ 6      From his location of approximately 10 feet from where the shooting occurred, Jackson observed defendant walking up to Hill while pointing the gun at Hill. When he spotted the gun, Jackson began running away, running approximately 30 feet before stopping and turning to face defendant; Jackson was unable to hear anything that was said while he was running. On redirect examination, Jackson testified that when he ran away, he ran backwards and was able to observe the scene while backing away without losing sight of either the victim or defendant. He overheard defendant tell the victim, "talk that shit now," to which the victim responded "what, what," while holding up his hands with his palms facing out; the victim was not holding anything in his hands. Jackson observed that the victim appeared surprised. Jackson observed defendant stand in place and shoot the victim twice. After Jackson observed defendant shoot the victim, Jackson "[t]ook off," but heard an additional four gunshots. Jackson later testified that after the shooting, he observed defendant "tak[ing] off" in the vehicle. Jackson did not hear the victim make any threats to defendant, but during the entire altercation, Jackson was unable to determine whether the victim had anything in his back pocket.

¶ 7      Jackson testified that he did not have any felony convictions. The State objected to defense counsel's question, engaging in the following colloquy:

"STATE: Judge, we spoke with Counsel prior to the witness testifying regarding his background. We agreed with Counsel and I thought we were in agreement with this that we were going to look into his background. There is a question as to

[2]The bench trial began on November 12, 2008, but extended over four dates due to witness unavailability. The dates of the trial were November 12, 2008, December 22, 2008, January 30, 2009, and March 5, 2009.

whether he has a felony conviction or not.

We don't believe he does, but we told Counsel we would look into it. So until we look into it, I would object to the question because it's our position that he does not have an adult felony conviction.

THE COURT: Do you have anything to support a felony conviction? I will allow you lee way [*sic*] to Cross Examine if you know what he's got, Mr. Vance. If you don't know what he's got, don't set the–

STATE: There's no good faith basis.

DEFENSE: What they tendered me today, it's a disposition of guilty on unlawful possession of a weapon by a felon. That's what it has right there.

STATE: May I see that, Counsel? These are also juvenile arrests, counsel.

DEFENSE: I have nothing further."

¶ 8        The State also called Anthony Green as a witness, and he testified that on July 21, 2006, approximately five minutes before the shooting, he was standing with defendant in front of the home of the victim's girlfriend, Star Gardner. Green observed the victim come out from the home with a handgun in his back pocket. When defendant observed the gun, he "disappeared." Green ran up to the victim and told him to put the gun away because both the victim and defendant were Green's friends and he did not want to see either killed. The victim then went back to Gardner's home; when he emerged from the home, Green no longer observed the gun.

¶ 9        Green testified that he observed the victim "pistol whip" defendant several days before the shooting. Green also testified that he had heard about the victim previously shooting defendant and when the State objected, the trial court sustained the objection.

"WITNESS: I told [Hill] to cool it because it was a lot of friction. They said that he shot. It was said that [Hill] shot Damon a few years back, and they was beating up my friend–well, Damon. They was putting pressure on the man.

STATE: Objection, Your Honor. Strike that answer as hearsay. He said they said.

THE COURT: Sustained as to that portion.

***

DEFENSE: Did you see [Hill] pistol whip [defendant]?

WITNESS: Yeah. And it was said that he shot the man in the leg a few years back.

THE COURT: Sustained as to that."

¶ 10        After speaking with the victim, Green left to find defendant and went to Corona's Food Mart, located a block from Gardner's home, to purchase a beverage. Green encountered defendant inside the store and they had a conversation as they walked from the store to a vehicle in the parking lot in which a man unknown to Green was sitting in the driver's seat; defendant entered the vehicle. Green spoke to defendant through the vehicle's passenger window when defendant pushed Green back and drew a gun. Green backed up, turned around, and observed the victim on a bicycle. Defendant opened the door, left the vehicle, and fired at the victim while he was on the bicycle. Green testified that once he

-4-

observed the victim being shot the first time, "it was like, I blanked out."[3]

¶ 11    The State questioned Green about a statement that Green gave to a police detective on July 25, 2006; Green acknowledged making the statement, but could not recall the date because he "[u]sed a lot of drugs." In the statement, Green stated that the victim did not have a weapon and never moved toward defendant. Green testified that while the statement included that assertion, "to be realistic, I didn't know what the hell was going on." He acknowledged that he signed the page and was allowed to make corrections but "I can't barely even read cursive, so I don't know how I can correct something that [the detective] wrote." However, Green admitted that there were several places within the statement where he had made corrections.

¶ 12    Green testified that after the victim was shot, Green was in shock and backed up, leaving the scene. He did not observe defendant entering the vehicle and leaving. The State read from Green's statement that Green was attempting to leave the scene when he observed defendant in a vehicle and heard defendant yell "GDK," which Green knew to mean "Gangster Disciple killer." After hearing the statement, Green testified that defendant "jumped in the car [, rode] past and said it to me, GDK." Green later testified that the yell could have come from defendant or from another member of the Black P Stones, named Mooney,[4] who was nearby. Green testified that he was a Gangster Disciple with the victim, but that there were no other Gangster Disciples in the area of the shooting. Green later testified that there were people near the victim when he was riding his bicycle toward defendant, and the people were the same ones who had been present when the victim had pistol-whipped defendant.[5]

¶ 13    Green testified that he observed defendant shooting the victim once, after which "it was over for me." The State read from Green's statement that once defendant shot the victim once or twice, the victim "went down,"and defendant stood over the victim, shooting him "maybe five or six or seven times altogether." During cross-examination, the defense questioned Green about the assertion in the statement, and Green testified that the statement could not be true because the gun could not have held that many bullets. Green further testified that the detective taking his statement did not write down "the majority of what the truth was or what I had to say," but that most of the assertions in the statement were true; while still under cross-examination, Green later testified that they were not true but admitted during redirect examination that he had reviewed the statement shortly before trial and told the State's Attorney the statement was true. During cross-examination, Green testified that he was considered a suspect at the time he gave his statement to police and heard the detective's account of what had occurred prior to giving his statement. He testified that he

[3]Green's testimony did not include any references to Jackson, and Jackson's testimony did not include any references to Green.

[4]The record does not identify Mooney.

[5]The record does not identify the other individuals who were present when the victim pistol-whipped defendant.

signed the statement because he was in fear of being sent to jail and that he had been in the holding cell of the Calumet Park police department for three days without being given food or water before signing the statement. Green also testified that he was unable to read the majority of the statement.

¶ 14 The State called Eric Celauro, a former assistant State's Attorney who worked in the Cook County State's Attorney's office on July 25, 2006, to testify about his interview with Green and the circumstances under which the statement was obtained. Celauro was contacted by two detectives from the Calumet Park police department about interviewing Green. The interview took place in the State's Attorney's office and Celauro, Green, and the two detectives were present. Celauro informed Green that he could either write a statement himself or Celauro could write it for him, after which Green would check it for accuracy. Green requested Celauro write the statement. The State then asked to publish the statement, and defense counsel objected. The court allowed the statement to be admitted into evidence and published for the purposes of impeaching Green's testimony.

¶ 15 In the statement, Green said that on July 21, 2006, at approximately 1 p.m., he was standing in front of his mother's house. He observed the victim leaving his girlfriend's house and further observed the handle of a gun protruding from the victim's back pocket. Since Green knew the victim well, he told the victim to "cool out" and put the gun away because there were children nearby. At the time, defendant was outside, one building away, and at some point, defendant went inside. Green said that defendant and the victim were in different gangs.

¶ 16 After Green spoke to the victim for a minute, he left to go to work. On the way, Green stopped at Corona's Food Mart and went inside. As he walked in, he observed defendant pull up in a vehicle in the passenger seat. Defendant entered the store and left before Green. As Green left the store, he observed defendant sitting in the passenger seat of the vehicle and walked over and spoke with defendant. Green observed a handgun in defendant's lap.

¶ 17 Green did not have a chance to have a real conversation with defendant because defendant looked around Green "like he saw someone." Green turned and observed the victim on a bicycle. Defendant pushed Green away and exited the vehicle. Defendant was a few feet from the victim and walked toward him with a pointed gun. Green did not observe the victim with a weapon and the victim never moved toward defendant. The victim attempted to get off of his bicycle as defendant "got right up on him" and said something like, "what's that shit you was talking about." The victim laid his bicycle on the ground and stood with his hands in the air, saying something like, "are you going to do this in broad daylight," and partially turned his back on defendant.

¶ 18 Defendant began shooting the victim from a foot or two away. After the first or second shot, the victim "went down" and defendant stood over him and continued shooting "maybe five or six or seven times altogether." Green said that at some point, Jackson or someone named "Moonie" also appeared on a bicycle and observed the scene as well. Green attempted to walk away from the scene and observed defendant "jump" into the vehicle and drive away, yelling "GDK" from the vehicle, which meant "Gangster Disciple killer."

¶ 19 The State's next witness was Dan Maloney, an assistant State's Attorney for Cook

County who was a witness to a conversation between one of the prosecutors, Shital Thakkar, and Green on November 12, 2008. Maloney testified that Green did not want to be involved and did not know why he was "locked up," after which Thakkar explained to Green that he was arrested and held pending his testimony at trial due to a warrant issued after he did not appear in court after being subpoenaed. Thakkar told Green that he would review Green's statement with him and, if something was untrue, Green should inform Thakkar. Thakkar took Green's handwritten statement and read it to Green, asking every few sentences if the statement was true; Green responded to each question that the statement was true. Green began laughing when Thakkar read the assertion regarding defendant yelling "GDK" and said something to the effect of "it was just funny; I can't believe he said that"; Green acknowledged remembering the incident.

¶ 20    The State additionally called Antrelle Clayborn as a witness, who testified that on July 21, 2006, he was driving his automobile when he received a cell call from defendant. Clayborn had met defendant previously, but did not "fully" know him. Defendant told Clayborn that he had just observed Clayborn driving down the street and asked Clayborn to pick him up in the alley behind defendant's house. Clayborn complied and defendant entered Clayborn's vehicle with a 40-ounce beer and began talking about an incident that had occurred between defendant and someone else. Clayborn attempted to testify that "[defendant] said it was somebody on the front that he thought had a gun who was going to shoot him," but the court sustained the State's objection on hearsay grounds. Clayborn was later permitted to testify that "[h]e said that someone was trying to shoot him" and "he said that someone was on the front." Clayborn did not realize that defendant was referring to the victim and Clayborn did not observe defendant with a gun at the time.

¶ 21    Defendant asked Clayborn to drive to Corona's Food Mart. Clayborn parked the vehicle and defendant exited the vehicle and entered the store while Clayborn waited. Defendant exited the store four or five minutes later and entered the vehicle. A man named Yayo, whom Clayborn recently discovered was Anthony Green, walked up to the passenger side of the vehicle and asked Clayborn to take him to work. Clayborn responded that he would as long as Green gave him money for gas.

¶ 22    Clayborn testified that the victim came "riding up" on his bicycle, not riding at a fast speed. Clayborn observed him through the side window and made a gesture indicating " 'What's up?' " and the victim responded with the same gesture. Clayborn testified that the victim was riding toward the store, which was in the same direction as the vehicle, but that he turned toward the store and eventually parked in front of it; Clayborn opined that "[h]e wasn't never close to us or nothing." The victim was alone when he entered the parking lot.

¶ 23    Clayborn testified that defendant lifted his shirt and Clayborn observed the handle of a handgun in defendant's waistband and defendant told Green to move out of the way so that defendant could open the door. Defendant jumped out of the vehicle while pulling out his gun, "said a few words" that Clayborn was unable to hear, and shot the victim while he was still on his bicycle. Clayborn was able to see both of the victim's hands when he was riding up to the store and testified that both of his hands were on the handlebars of the bicycle and he was not holding anything else; Clayborn further testified that the victim's hands never left the handlebars. Clayborn was unable to see whether the victim had anything

in his back pocket because his shirt was covering it.

¶ 24    Clayborn testified that defendant was approximately eight feet away from the victim when he first saw the victim and walked to approximately four feet from the victim when he shot the victim. Clayborn testified that the victim was facing away from them, looked over his left shoulder, and was shot in the left side of his back. Clayborn testified that he knew where the bullet hit the victim by observing the bullethole and seeing blood.

¶ 25    When Clayborn observed the first shot, he reversed his vehicle and attempted to back into traffic. However, there was traffic on the street and Clayborn was forced to move slowly. He heard two or three more gunshots. By the time that Clayborn had straightened his vehicle to leave, defendant had opened the door and jumped into the vehicle. Clayborn testified that he had "no choice but to take off" because defendant had a gun and Clayborn "barely knew" him. Clayborn spoke to defendant in the vehicle, explaining that Clayborn lived in the neighborhood and that the shooting would be a life-changing event. Defendant responded that the victim " 'had to get it.' " On cross-examination, Clayborn admitted that the statement that he gave to police did not contain the assertion that defendant said that the victim " 'had to get it.' " Clayborn drove to his cousin's house, where he told his family what had occurred and defendant gave Clayborn's cousin his gun to "put it up." Defendant received a number of telephone calls and left.

¶ 26    Clayborn took the gun the next day and sold it. Clayborn attempted to retrieve the gun approximately a month later, when he was taken into custody by the Calumet Park police, but was not able to repurchase the gun. Clayborn testified that he approached the police himself, because he had heard that they were searching for him and wanted to clear his name. While Clayborn was speaking with the police, they told him that defendant said that Clayborn had a gun; Clayborn denied having a gun.

¶ 27    The State also called Mohammed Suleiman as a witness. Suleiman was working at Corona's Food Mart on July 21, 2006. Shortly before 1 p.m., defendant entered the store, purchased some potato chips, and returned to the passenger side of a vehicle parked approximately 2 to 2 1/2 parking spaces from the store's front door; Suleiman did not observe a gun when defendant was inside the store. A man named Yale was standing near the passenger side door of the vehicle. Suleiman was sweeping the rug near the store's glass front door and observed the victim riding on his bicycle alone, coming from the opposite side of the parking lot. The victim did not have a gun in his hand and Suleiman did not observe the victim reaching for his waistband; while he was riding his bicycle, the victim's hands were on the handlebars. However, Suleiman was unable to observe the victim's back pocket. Suleiman opined that the victim was going to come to the store to make a purchase, since he was a regular customer. Suleiman observed the victim ride to within a few feet of the front door. He did not notice anything unusual about the victim and did not pay him any particular attention; after he first noticed the victim riding toward the store and before he heard the gunshots, Suleiman was not keeping eye contact.

¶ 28    Suleiman turned around to roll up the store's rug and heard several shots. He turned back and observed the victim on the ground and defendant entering the vehicle and leaving. Suleiman noticed a gun in defendant's hand. Suleiman testified that he never actually saw defendant shoot the victim because by the time he turned around, defendant was running

toward the vehicle. Suleiman moved all of the store's customers to the back of the store approximately 50 to 60 feet away and called the police when he returned to the front of the store; Suleiman testified that it took 5 to 10 seconds to move everyone to the back of the store and estimated that he called the police within 15 seconds of the shooting.

¶ 29 Suleiman was able to see the victim lying on the ground with blood "all over his shirt" while he was calling police. No one approached the victim or took anything from him. Suleiman observed the fallen victim until the police arrived within a matter of seconds.

¶ 30 The State also called Calumet Park police officer Vito DiPaolo as a witness. Officer DiPaolo testified that he was called to the scene of the shooting on July 21, 2006. When he arrived at the scene, there were several people standing around, and the victim was lying on the ground in a fetal position in a pool of blood, with a bicycle a few feet away. There was no weapon recovered from the scene.

¶ 31 After presenting its witnesses, the State made an oral motion *in limine* to preclude a portion of Star Gardner's expected testimony in which she would testify that the victim told her that he had previously "slapped the defendant around" on the basis of hearsay. Defense counsel asked for time in which his investigator could contact Gardner to determine if she observed the slapping incident but that it was difficult to find Gardner since she refused to allow the State to provide her address to the defense.[6] The court continued the trial but ruled that "[at] this juncture, without a valid exception to that hearsay, it could not come in and this Court would not allow it to come in under those circumstances."

¶ 32 When the parties next came before the court, the prosecutor informed the court that he had spoken with Gardner and determined that all of her knowledge of the slapping incident was based on what the victim had told her and she did not witness the incident. The State renewed its objection on hearsay grounds and the trial court made a preliminary ruling that the testimony would not be allowed.

¶ 33 The parties also proceeded by way of stipulation. The parties stipulated that Dr. Nancy Jones, a forensic pathologist with the Cook County medical examiner's office, would testify that she performed a postmortem examination of the victim on July 22, 2006, in which she found a "through-and-through" gunshot wound to the victim's lateral chest, which she classified as an entrance wound. There were also three gunshot wounds to the left back, from which medium-caliber, partially copper-jacketed, lead bullets were recovered. None of the gunshot wounds included evidence of close-range fire. Dr. Jones would further testify that in her expert opinion, the cause of the victim's death was multiple gunshot wounds and the manner of death was homicide.

¶ 34 The parties also stipulated that Illinois State Police forensic scientist William Anselme would testify that the three bullets were fired from the same firearm. The parties further stipulated to the fact that defendant was arrested on August 14, 2006, and that there

[6]Gardner was initially the State's witness, but the State determined that it did not need her testimony and did not call her during its case-in-chief. The defense then wished to call her as a defense witness, but Gardner refused to allow the defense to have her contact information. It appears that during the trial, the State acted as a middleman when the defense needed to contact Gardner and Gardner only spoke with defense counsel's investigator.

was probable cause for his arrest.

¶ 35    The State entered several exhibits into evidence, then rested its case-in-chief. Defendant made a motion for a directed finding, which was denied.

¶ 36    In his case-in-chief, defendant called Patricia Simms to testify on his behalf. Simms was visiting her daughter on July 21, 2006, when defendant knocked on the door. After defense counsel asked Simms what happened when she answered the door, the State objected:

> "WITNESS: He asked could he eat–
>
> STATE: Objection, Judge. Any statements that the defense is seeking to introduce by the defendant through this witness is inadmissible hearsay.
>
> THE COURT: Sustained."

Prior to defendant knocking on the door, Simms had seen the victim and a man called Yayo outside. Simms knew the victim through Star Gardner, the victim's girlfriend, who lived next door. Simms answered the door and defendant asked if he could come in. The State objected and the court sustained the objection, instructing Simms: "Ma'am, you can't testify as to anything that he told you." Simms testified that defendant appeared scared. He made a telephone call for someone to pick him up and left through the back door; defendant was in the house for less than five minutes.

¶ 37    Defendant also testified on his own behalf. On July 21, 2006, defendant was walking down the street with Green when the victim came out of an apartment. Defendant observed a pistol in the victim's back pocket. The victim was approximately 10 feet from defendant and told defendant, " 'I got you now; I'm going to kill you.' " Green told the victim, " 'Man, hold on. Man, you don't need to be doing this out here.' "

¶ 38    Defendant testified that it was not the first occasion in which the victim had threatened him with the same gun. Approximately two or three days earlier, defendant was with Green when the victim and three of his friends approached. The victim told defendant that "he didn't want to see [defendant] around there no more." The victim's friends held defendant down and the victim "pistol whipped" defendant, hitting him across the head several times with the butt of the gun. Green told them to stop and ran away. Defendant did not have a gun during the incident and thought that the victim was going to kill him.

¶ 39    On July 21, when the victim threatened to kill defendant, defendant did not have a gun. After the victim threatened him, defendant testified that "I felt he was going to kill me. I was in fear of my life. He said he was going to kill me. He said he was going to kill me. I was in fear of my life." Defendant ran next door to Simms' house and "asked her please let me come in the house 'cause somebody out there got a gun; he talking about he gonna kill me." Simms opened the door and allowed defendant to come inside. Defendant viewed Clayborn driving past the window and called him to ask him to pick defendant up. At the time, the victim was still in front talking with Green. When Clayborn arrived, defendant ran to his vehicle and they drove away. Clayborn asked defendant why he was running our of the back door of Simms' house, and defendant told him " 'This guy in the front, he got a gun, man; he just told me he gonna kill me, man, just get me away from the area.' "

¶ 40    They stopped at the store and both went inside, where defendant purchased potato

chips. Defendant did not have a gun when he went into the store, nor did he have a gun at Simms' house or when exiting the store. When they came out, defendant jumped into the passenger seat. Green was walking past and stopped at the passenger side of the vehicle, where he said that he wanted a ride to work. Clayborn told Green that he could not have a ride unless he had money for gas. While they were talking, defendant looked to the right and saw the victim approaching on a bicycle at a fast pace toward the vehicle with some friends following him on foot; defendant testified that the friends were the same three friends as in the pistol whipping incident.

¶ 41    Defendant had been leaning back in the passenger seat and when he turned, he and the victim caught each other's attention. Defendant testified that "[o]ur face[s] saw each other, and I just–he just pointed at me and I looked back at [Clayborn] and I told him, man, we got to go, man, this is the same guy that just had a gun on me." Defendant first noticed the victim when he was 30 to 35 feet away and the victim rode his bicycle to within a few feet of the passenger side of the vehicle. While the victim was riding his bicycle, defendant observed him reach into his back pocket, where defendant had previously seen his gun. The victim dismounted the bicycle and pulled his gun, stating " 'I got you now,' " and Clayborn passed defendant a gun. Defendant did not have a gun before that time, and the gun that Clayborn passed to him did not belong to defendant; defendant did not know whether the gun was loaded.

¶ 42    Defendant exited the vehicle; he testified that he was "trapped." The victim pointed his gun at defendant and said that he was going to kill him. Defendant fired his gun because he was afraid that the victim would kill him; he did not know how many times he shot the victim, but "just kn[e]w the gun went off." Defendant testified that he never shot the victim in the back. The victim did not fire his gun. Defendant then entered the vehicle and Clayborn drove away; defendant did not say anything after the shooting. Defendant was scared after the shooting and did not know what to do. Defendant did not tell Clayborn to drive away, did not force Clayborn to drive him to Clayborn's family's house, and did not ask anyone to dispose of the gun because the gun was not his.

¶ 43    Defendant testified that he had only had a few interactions with the victim over several years and did not know him very well, but that "[f]or some reason," the victim did not like him. Defendant also testified that the victim robbed him several years ago. However, defendant testified that "I ain't wanna kill him. I ain't have no plans on seeking no revenge on him." Defendant testified that he was defending himself. Defense counsel asked defendant about a prior shooting, and the State objected:

> "DEFENSE COUNSEL: Now, so–and the State had asked you, you shooting–did you shoot him because he had shot you approximately–in 2004. They asked you that, right?
>
> DEFENDANT: Yes.
>
> DEFENSE COUNSEL: That's not why you shot him?
>
> DEFENDANT: No.
>
> DEFENSE COUNSEL: Now, you mentioned on cross-examination that he had shot you in 2004 during a robbery; is that correct?

DEFENDANT: Yes.

STATE: Objection. That wasn't the testimony.

THE COURT: Sustained.

DEFENSE COUNSEL: You mentioned that he had robbed you in 2004 on cross-examination; is that correct?

DEFENDANT: Yes."

¶ 44 After defendant testified, the defense rested its case-in-chief and the parties presented their closing arguments. The court found that both sides agreed that defendant was the person who killed the victim and that the only question was whether he was justified in doing so by acting in self-defense. The court found that defendant and the victim had "history behind them," including defendant's testimony that the victim robbed and pistol-whipped defendant. However, the history did not justify the shooting. The court found that accepting defendant's testimony would result in a finding that the shooting was justified by self-defense but noted that other testimony needed to be considered as well. In recounting the other witnesses' testimony, the court noted:

"Then the Court hears testimony from Mohammed Suleiman who was the store clerk there perhaps I guess you could call him one of the most independent witnesses there who testified similarly in the fact that he was sweeping the floor as he saw the victim ride up on his bicycle towards the store, and thereafter the defendant got out and shot him several times and he did not see any gun pointed at the defendant and he did not see any gun whatsoever. And after the shooting occurred, he escorted all the people in the store towards the back immediately and came back again and saw the car drive away and saw the victim dead."

¶ 45 The court concluded that it did not accept defendant's testimony and did not find it credible. In describing inconsistencies in defendant's testimony, the court again referred to Suleiman:

"But perhaps the most compelling of all witnesses, the State [*sic*] finds is the independent witness Mr. Mohammed Suleiman, someone detached from everybody here who disputes the defendant's testimony who shows that what occurred [happened] because the defendant wanted to do so and not in any self-defense situation."

After considering whether defendant acted in self-defense "or even unreasonably acted in self-defense," the court found defendant guilty of first degree murder.

¶ 46 On May 4, 2009, the parties came before the trial court for sentencing and defendant's motion for a new trial. In denying the motion for a new trial, the court discussed the State's witnesses and, specifically, Suleiman:

"The Court noted amongst those witnesses, which though there may be impeachment on some of them, the more compelling of the witnesses was the independent shopkeeper who was in the store who did observe this as well and he observed the victim with no weapon, whatsoever, before or after the incident occurred, but for a brief period of time where he hustled the patrons of the store to the back as gunshots were heard, he saw the entire incident occur.

-12-

This was, again, complemented by other State witnesses as well."

¶ 47 During sentencing, the State presented a victim impact statement from the victim's mother in aggravation; defendant provided no evidence in mitigation. After the parties presented arguments in aggravation and mitigation, defendant addressed the court in allocution. Defendant told the victim's mother that he was sorry for the shooting and that he never intended to kill the victim but acted in self-defense. The court sentenced defendant to 50 years in the Illinois Department of Corrections and defendant filed a notice of appeal the same day.

¶ 48                                            ANALYSIS

¶ 49 On appeal, defendant argues that his conviction should be reduced to second degree murder and remanded for resentencing because he acted with an actual, though unreasonable, belief in self-defense. Alternatively, defendant claims that he is entitled to a new trial because: (1) the trial court erred in barring evidence that supported defendant's theory of self-defense, (2) the trial court relied on an erroneous recollection of Suleiman's testimony in weighing his credibility, and (3) the State failed to disclose Jackson's felony conviction and allowed him to provide perjured testimony when it failed to correct Jackson's misstatement of his criminal history. We consider each of defendant's arguments in turn.

¶ 50                                   Second Degree Murder

¶ 51 Defendant first argues that his conviction should be reduced to second degree murder because the evidence established that he acted under an actual, though unreasonable, belief in self-defense. Under section 9-2 of the Criminal Code of 1961 (the Code), a person commits second degree murder when he commits first degree murder and "[a]t the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing ***, but his belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2004). For a defendant to be guilty of second degree murder, the State must first prove the defendant guilty of first degree murder beyond a reasonable doubt. 720 ILCS 5/9-2(c) (West 2004). The burden then shifts to the defendant to prove the existence of the mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2004). The State is not required to prove the absence of the mitigating factor beyond a reasonable doubt. *People v. Shumpert*, 126 Ill. 2d 344, 352 (1989).

¶ 52 The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder or was justified because acting in self-defense is a question for the finder of fact. *People v. Huddleston*, 243 Ill. App. 3d 1012, 1021 (1993). The finder of fact has the responsibility to determine the credibility and weight of witness testimony, to resolve conflicts and inconsistencies present therein, and to draw reasonable inferences from the evidence. *People v. Berland*, 74 Ill. 2d 286, 305-06 (1978); *People v. Hawkins*, 296 Ill. App. 3d 830, 837 (1998); *People v. Young*, 187 Ill. App. 3d 977, 984 (1989). In the case at bar, defendant is not challenging the trial court's determination that the State proved the elements of first degree murder beyond a reasonable doubt, nor is he arguing that the trial court erred in rejecting an affirmative defense of self-defense. Instead, he argues that the trial court erred

-13-

by finding that defendant did not have an unreasonable belief in self-defense. Accordingly, we must determine whether, viewing the facts in the light most favorable to the State, any rational trier of fact could have found that defendant failed to prove the mitigating factor by a preponderance of the evidence. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996); *Huddleston*, 243 Ill. App. 3d at 1021.

¶ 53 Defendant claims that he proved an unreasonable belief in self-defense because the victim had perpetrated two violent attacks against defendant in the past and the victim threatened defendant's life while brandishing a gun shortly before the shooting. This history with the victim led defendant to believe that the victim continued to possess a gun when he arrived at the store and that the victim would "follow through on his threat to kill him."

¶ 54 However, even if defendant's account of his history with the victim is true, those facts are not the only evidence in the record. While the victim's history of violence toward defendant may be relevant to determining whether defendant had an actual belief in the need to use self-defense, defendant's behavior during the altercation should also be considered. See *Young*, 187 Ill. App. 3d at 984 ("[I]n weighing the defendant's version of the incident, the trier of fact should consider the probability or improbability of the defendant's account, the circumstances surrounding the crime and the relevant testimony of other witnesses."). It is undisputed that defendant was in Clayborn's vehicle at the time he first noticed the victim and it is also undisputed that the victim arrived on the scene on a bicycle. Clayborn, Green, and Jackson testified that defendant had a gun in his possession at the time he exited Clayborn's vehicle to confront the victim. Nobody, other than defendant,[7] testified that the victim had anything in his hands or reached for his back pocket; indeed, every witness to the shooting testified either that the victim's hands were on the handlebars of his bicycle or were raised with open palms. No weapon was recovered on the victim's body or in its vicinity. Jackson's testimony and Green's statement to police indicated that defendant addressed the victim by saying, "talk that shit now," or "what's that shit you was talking about" prior to shooting him; Clayborn testified that defendant said a few words to the victim that Clayborn was unable to hear. After the shooting, defendant left the scene and did not call police. Green testified that defendant yelled "GDK," and Clayborn testified that defendant told him that the victim " 'had to get it.' "

¶ 55 Based on all of the evidence in the record, it is entirely possible that a finder of fact could have found that defendant had failed to prove that he unreasonably believed he was acting in self-defense. Despite any history between the victim and defendant, at the time of the shooting, defendant was in a vehicle while the victim was on a bicycle. Defendant addressed the victim prior to shooting him, and the victim, other than in defendant's testimony, did not display a weapon nor was one located after his death. After the shooting, defendant fled the scene and made comments indicating that he felt no remorse over the killing. The trial court determined that defendant's testimony was not credible. We cannot find that the trial court's decision was such that no rational trier of fact could have reached

---

[7]In his brief, defendant does not address his testimony that the victim was pointing a gun at him at the time of the shooting but solely focuses on the history between the victim and defendant to support his theory of an unreasonable belief in self-defense.

the same conclusion.

¶ 56    Defendant relies on two cases to demonstrate that the violent past between the victim and defendant made him unreasonably fear for his life. In *People v. Hawkins*, 296 Ill. App. 3d 830, a conviction for first degree murder was reduced to second degree murder based on the defendant's unreasonable belief in self-defense. The appellate court found that the defendant had an actual belief that he had the right to use self-defense against the victim in part because of the victim's previous history of violence against the defendant and the presence of drugs and alcohol during the incident. *Hawkins*, 296 Ill. App. 3d at 837-38. However, importantly, the court also considered the circumstances of the actual fatal altercation between the victim and the defendant, to which defendant was the only person to testify. *Hawkins*, 296 Ill. App. 3d at 838. The defendant testified that (1) the victim reached into the defendant's pockets after the defendant refused to lend him money, (2) the victim punched the defendant in the head, causing the defendant to fall to the floor, (3) the victim threw a brick at the defendant, narrowly missing the defendant's head and breaking a glass door, (4) the victim approached the defendant and threatened to kill him, and (5) the defendant attempted to leave, but the victim blocked his way, grabbed him, and swung at him with a closed fist. *Hawkins*, 296 Ill. App. 3d at 838. The appellate court found that the defendant's belief in the need to use a deadly weapon to defend himself was unreasonable, but found that the defendant proved by a preponderance of the evidence that he had an unreasonable belief in self-defense and reduced the conviction to second degree murder. *Hawkins*, 296 Ill. App. 3d at 838.

¶ 57    Similarly, in *People v. Collins*, 213 Ill. App. 3d 818 (1991), the defendant's conviction for the first degree murder of his unarmed roommate was reduced to second degree murder when the appellate court found that the evidence was "too inconclusive, vague, and contradictory" to sustain a conviction for first degree murder but was sufficient to support a conviction for second degree murder. *Collins*, 213 Ill. App. 3d at 826. As part of the defendant's testimony, he testified that the victim had a violent temper. *Collins*, 213 Ill. App. 3d at 821. The court found that there was no physical evidence to support the State's theory that the defendant fired two shots, which was critical to the State's ability to prove intent, and that the only witness to suggest two shots was inconsistent in his testimony and admitted to having been drinking at the time of the shooting. *Collins*, 213 Ill. App. 3d at 824-25. Additionally, the court found that the testimony of the witness and the defendant, the only two people to testify to the circumstances of the shooting, supported the theory of second degree murder because both testified that the defendant and the victim were wrestling with a gun at the time the victim was shot. *Collins*, 213 Ill. App. 3d at 825. Finally, the court held that while a loaded weapon was present, without more, it did not "satisf[y] the inference of murder in the first degree as opposed to lesser included offenses." *Collins*, 213 Ill. App. 3d at 826.

¶ 58    We find defendant's cases distinguishable from the case at bar. While *Hawkins* and *Collins* involve a history of violent behavior by the victim, that is the only similarity between them and the case here. However, the differences between defendant's cases and this case are significant. In *Hawkins*, the only testimony about the killing itself involved a number of details of the victim's aggressive behavior at the time of the altercation. See *Hawkins*, 296

-15-

Ill. App. 3d at 838. Likewise, in *Collins*, the witness and the defendant both testified that the defendant and the victim were wrestling with the gun at the time that it discharged. See *Collins*, 213 Ill. App. 3d at 825.

¶ 59       Here, however, four witnesses testified about the circumstances of the shooting, as did defendant. Other than defendant, all four of the witnesses testified that they saw the victim's hands and that the victim was not holding a weapon; no weapon was recovered at the scene. Moreover, three of the witnesses indicated that defendant addressed the victim in some way prior to shooting him and that defendant was armed prior to exiting the vehicle. Finally, it is undisputed that defendant was in an automobile and the victim was on a bicycle when defendant first noticed the victim. The testimony from every witness apart from defendant indicated that the situation between defendant and the victim was not a scene of active aggression on the part of the victim, making the factual situation here unlike that in *Hawkins* or *Collins*. In the case at bar, there were a number of witnesses testifying to the circumstances of the shooting, and the trial court was entitled to credit the witnesses' testimony instead of defendant's to find that defendant did not prove that he had an unreasonable belief in the need to use self-defense against the victim. See *Young*, 187 Ill. App. 3d at 984 ("The trier of fact is not required to believe the defendant's version of the events.").

¶ 60       Defendant also argues that his fear was corroborated by the testimony of the State's witnesses in three respects. First, defendant claims that his testimony that he feared the victim was corroborated by testimony of Jackson and Green that defendant appeared startled when he first noticed the victim and that "the look on [defendant's] face" indicated that "something was wrong." Defendant also claims that Green corroborated defendant's testimony that the same people who had pistol whipped defendant were following the victim into the parking lot and that Green also feared that the victim would shoot him. Finally, none of the witnesses testified that they could observe the victim's back pocket. We find defendant's arguments unpersuasive.

¶ 61       We note that defendant frames his argument in the terms that the State failed to "rebut" the theory that defendant was acting with an unreasonable belief in self-defense. However, after the State has established each element of first degree murder beyond a reasonable doubt, which defendant does not challenge here, the burden is on *defendant* to prove the existence of a mitigating factor by a preponderance of the evidence. See 720 ILCS 5/9-2(c) (West 2004). The State is not required to prove the absence of the mitigating factor. *Shumpert*, 126 Ill. 2d at 352.

¶ 62       Here, a rational trier of fact could have found that defendant failed to meet his burden despite any corroboration by the State's witnesses. Defendant's expression when he noticed the victim could have been due to a number of emotions other than fear, such as anger or surprise. Additionally, Green's testimony that he observed people accompanying the victim was impeached by Green's statement to police and his testimony about fearing that the victim would also shoot him was not the strong corroboration that defendant claims; his testimony about fearing that the victim would shoot him was preceded by the following answer:

           "DEFENSE COUNSEL: But at the time this happened, you were in fear Robbie

-16-

[the victim] may shoot you, right?

> WITNESS: I was in fear Damon may have shot me. Robbie could have shot me. Driver could have shot me. I would have shot me.

> DEFENSE COUNSEL: My question is you were in fear that Robbie could, may have shot you?

> WITNESS: Yeah."

Finally, the inability of the witnesses to observe the victim's back pocket concerns the reasonableness of defendant's claimed belief that the victim was carrying a gun and does not "corroborate" defendant's theory that he actually feared the victim. Most importantly, the determination of the credibility of witnesses lies squarely with the finder of fact and we are not in a position to reweigh the trial court's credibility determination. *Berland*, 74 Ill. 2d at 305-06. Even if defendant's claims were true, they would not tip the balance of the evidence to such an extent that no rational finder of fact could find that defendant failed to prove the existence of the mitigating factor.

¶ 63    Defendant finally argues that the fact that a gun was not recovered does not alone establish that the mitigating factor was not present, nor do defendant's later comments, which defendant describes as "adrenalin-fueled bravado." We agree that all of the facts should be considered in determining whether defendant proved an unreasonable belief in self-defense. See *Collins*, 213 Ill. App. 3d at 826; *Young*, 187 Ill. App. 3d at 984. However, defendant focuses solely on the history of violence between the parties and does not address the testimony regarding defendant's actions from the time he noticed the victim riding his bicycle into the store's parking lot. As we have noted, that testimony supports the trial court's finding that defendant did not have an unreasonable belief in the need to use self-defense, and thus, we cannot find that the trial court's decision was such that no rational trier of fact could have reached the same conclusion.

¶ 64                    Admission of Evidence

¶ 65    Defendant's second claim is that the trial court erred in failing to allow defendant to present testimony about (1) the victim's violent actions toward him and (2) defendant's comments in response to the victim's threat shortly before the shooting. Defendant acknowledges that these claims have been forfeited because he failed to raise them in his posttrial motion. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 66    Nevertheless, defendant urges us to review this claim under plain error. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. In a plain error analysis, "it is the

defendant who bears the burden of persuasion." *Woods*, 214 Ill. 2d at 471. However, in order to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 67    In the case at bar, we must apply the plain error review to an issue that already carries an abuse of discretion standard of review. The decision to admit or exclude evidence rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005).

¶ 68                                    *Victim's Violent Acts*

¶ 69    Defendant first argues that the trial court erred in excluding evidence of the victim's prior violent acts against defendant. Specifically, defendant claims that the trial court erred in (1) preventing Green from testifying that the victim had previously shot defendant and (2) granting the State's motion *in limine* to preclude Gardner from testifying that the victim had "slapped the defendant around."

¶ 70    In *People v. Lynch*, 104 Ill. 2d 194, 199-200 (1984), the Illinois Supreme Court held that when the theory of self-defense is raised, evidence of the victim's violent character may be offered in two circumstances: (1) to demonstrate that the defendant's knowledge of the victim's violent tendencies affected the defendant's perceptions of and reactions to the victim's behavior and (2) to support the defendant's version of the facts where there are conflicting accounts of what happened. See also *People v. Figueroa*, 381 Ill. App. 3d 828, 841 (2008); *People v. Nunn*, 357 Ill. App. 3d 625, 631 (2005); *People v. Cook*, 352 Ill. App. 3d 108, 126-27 (2004). Under the first *Lynch* purpose, the knowledge of the victim's character is relevant only when the defendant knew of the victim's violent nature. *Lynch*, 104 Ill. 2d at 200; *Nunn*, 357 Ill. App. 3d at 631. Under the second purpose, the defendant's knowledge of the victim's character is irrelevant. *Lynch*, 104 Ill. 2d at 200-01; *Nunn*, 357 Ill. App. 3d at 631. In the case at bar, defendant argues only that testimony regarding the victim's violent acts should have been admitted under the first *Lynch* purpose.

¶ 71    Green's testimony that the victim shot defendant several years earlier was an incident that was known to defendant, since he was the person that the victim shot. Additionally, knowledge that the victim had shot defendant previously could have affected defendant's perception of the situation. However, the problem with Green's testimony is that Green did not testify that he observed the shooting incident, but testified that he had been told about it by unnamed individuals:

> "WITNESS: I told [Hill] to cool it because it was a lot of friction. *They said* that he shot. *It was said that* [Hill] shot Damon a few years back, and they was beating up my friend–well, Damon. They was putting pressure on the man.
>
> STATE: Objection, Your Honor. Strike that answer as hearsay. He said they said.
> THE COURT: Sustained as to that portion.
> ***
> DEFENSE: Did you see [Hill] pistol whip [defendant]?

-18-

WITNESS: Yeah. And *it was said* that he shot the man in the leg a few years back.

THE COURT: Sustained as to that." (Emphasis added.)

Since Green was testifying to out-of-court statements that were being used to prove that the victim had shot defendant, Green's testimony was hearsay and was excluded on that basis. See *People v. Caffey*, 205 Ill. 2d 52, 88 (2001) (quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)) (Hearsay evidence consists of " 'an out-of-court statement offered to prove the truth of the matter asserted' " and " 'unless it falls within an exception to the hearsay rule,' " this type of evidence " 'is generally inadmissible due to its lack of reliability' " and the inability of the opposing party to confront the declarant.). See also *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009).

¶ 72      Defendant argues that he should be given great latitude when presenting *Lynch* evidence and the fact that the evidence satisfies the first *Lynch* purpose should suffice. However, *Lynch* did not hold that relevance was the sole factor by which courts should exclude evidence. Indeed, *Lynch* instructed that the defendant could demonstrate that the victim was the aggressor by "appropriate evidence" and contained a discussion about whether the defendant's convictions for battery would be "competent evidence" of his violent character. *Lynch*, 104 Ill. 2d at 200, 204. Proof is needed that the victim committed the crimes, and "a prior altercation or an arrest, without a conviction, can be adequate proof of violent character *when supported by firsthand testimony as to the victim's behavior*." (Emphasis added.) *Cook*, 352 Ill. App. 3d at 128; see also *People v. Huddleston*, 176 Ill. App. 3d 18, 28 (1988) (noting that a victim could testify that the decedent had struck her, but a police officer who had not observed the incident could not). In the case at bar, there was no firsthand evidence that the victim had previously shot defendant, and the trial court did not abuse its discretion by sustaining the State's objections to Green's testimony on the basis of hearsay.

¶ 73      Similarly, defendant was precluded from offering Gardner's testimony that the victim had "slapped the defendant around" on the basis of hearsay. Gardner did not observe the victim slapping defendant and her proposed testimony was based on a statement that the victim had made to her. Defendant does not claim that Gardner observed the slapping incident and would have been able to testify to her own observations. Instead, defendant argues that Gardner's testimony should have been admitted because she would have provided reputation testimony about the victim's propensity for violence toward defendant.

¶ 74      Reputation witnesses must be shown to have "adequate knowledge of the person queried about" and the evidence of reputation "must be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness." *People v. Moretti*, 6 Ill. 2d 494, 523-24 (1955); *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010). Defendant argues that Gardner, as the victim's girlfriend, had adequate knowledge of the victim and "would not have asserted her personal opinion of [the victim], but rather, related a specific incident that supported [the victim's] violent disposition toward [defendant]." However, there is no indication in the record that Gardner's testimony would have been based upon contact with the victim's neighbors and associates or her personal observations, rather than on her personal opinion. Instead, the record demonstrates that Gardner's

testimony would have been based on one statement made to her by the victim. Even if Gardner's testimony was characterized as reputation evidence, we cannot find that the trial court abused its discretion in excluding it.

¶ 75 Moreover, even if the trial court had abused its discretion concerning the *Lynch* evidence, it did not rise to the level of plain error. The exclusion of the testimony was not so serious that it affected the fairness of defendant's trial, so we consider whether the evidence was so closely balanced that it threatened to tip the scales of justice against defendant. See *Nunn*, 357 Ill. App. 3d at 630 (exclusion of *Lynch* testimony did not affect defendant's substantial rights); *People v. Crum*, 183 Ill. App. 3d 473, 485 (1989) (any error made by the trial court was harmless because there was sufficient evidence to convict the defendant beyond a reasonable doubt).

¶ 76 In the case at bar, the trial court's decision not to allow Green's and Gardner's testimony did not threaten to tip the scales of justice against defendant. Defendant was permitted to testify that the victim had robbed him, which was the same incident in which he was supposedly shot. Additionally, Green and defendant both testified to the pistol-whipping incident, so the trial court was aware that there was a history of the victim acting violently toward defendant. The trial court also heard from Green and defendant that the victim had threatened defendant with a gun several minutes prior to the shooting. Finally, the evidence was weighed heavily against defendant, with four eyewitnesses to the circumstances of the shooting. Any additional testimony concerning the victim's violent behavior toward defendant would not have tipped the scales in defendant's favor.

¶ 77 Defendant argues that the absence of Green's testimony concerning the prior shooting was particularly harmful because the only other testimony as to the shooting came from defendant.[8] He points to the case of *People v. Gossett*, 115 Ill. App. 3d 655 (1983), in support, noting that the *Gossett* court found that the defendant's testimony as to the victim's aggressive character did not render the trial court's error harmless. However, in *Gossett*, the defendant provided the only evidence as to the victim's aggressive character other than brief witness testimony concerning the victim's general reputation for violence in the community. *Gossett*, 115 Ill. App. 3d at 664. Here, by contrast, defendant testified to the robbery, the pistol whipping, and the threat shortly before the shooting. His testimony regarding the pistol whipping and the threat were corroborated by Green's testimony, and Clayborn and Simms testified to defendant's demeanor directly after receiving the threat. Several witnesses also testified to the victim's membership in the Gangster Disciples gang. Thus, unlike in *Gossett*, there was evidence of several instances of violent behavior by the victim and multiple witnesses testifying.

¶ 78 We find that the trial court did not abuse its discretion in preventing Green from testifying to the prior shooting or in preventing Gardner from testifying to the slapping incident. Since there was no error as to the trial court's decision concerning either Green's or Gardner's testimony, there could not have been plain error. Additionally, even if there had been any error, it would not have risen to the level of plain error because the evidence was

---

[8]We note that defendant was permitted to testify that the victim robbed him, not that the victim shot him.

not closely balanced. Accordingly, we affirm the trial court's decision.

¶ 79                                     *Spontaneous Declarations*

¶ 80          Defendant also argues that the trial court erred in preventing Clayborn and Simms from testifying to defendant's statements when he entered Simms' house and Clayborn's automobile. A statement that would normally be excluded on hearsay grounds may be admissible if it falls under the hearsay exception for spontaneous declarations. For a statement to be admissible under the spontaneous declaration exception, (1) there must have been an occurrence that was sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must not have been time between the occurrence and the statement for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005); *People v. Williams*, 193 Ill. 2d 306, 352 (2000). In determining whether the exception is applicable, courts apply a totality of the circumstances analysis, considering a number of factors including "time, 'the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest.' " *Williams*, 193 Ill. 2d at 352 (quoting *People v. House*, 141 Ill. 2d 323, 382 (1990)).

¶ 81          The determination of whether a statement qualifies as a spontaneous declaration involves factfinding and assessing the credibility of witnesses. *People v. Nestrock*, 316 Ill. App. 3d 1, 13 (2000). A trial court is vested with considerable discretion in determining whether a statement is a spontaneous declaration, since each case must be determined on its own facts. *People v. Gibson*, 99 Ill. App. 3d 1068, 1076 (1981). Accordingly, we review the trial court's decision for an abuse of discretion. See *People v. Nevitt*, 135 Ill. 2d 423, 444 (1990); see also *Snelson*, 204 Ill. 2d at 24 (the decision to admit or exclude evidence rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of discretion).

¶ 82          In the case at bar, defendant claims that Clayborn's statement that "[defendant] said it was somebody on the front that he thought had a gun who was going to shoot him," was a spontaneous declaration. Being threatened with a gun could be a sufficiently startling event to produce a spontaneous statement. However, the testimony of both Green and defendant established that the victim had the gun in his waistband when defendant encountered him, which is a less startling event. Additionally, the conversation with Clayborn occurred minutes after the confrontation with the victim, so defendant argues that there was little time for defendant to fabricate a statement, and the statement related to the circumstances of the occurrence. However, time is an "elusive" factor "whose significance will vary with the facts of each case." *House*, 141 Ill. 2d at 382 (citing *Nevitt*, 135 Ill. 2d at 444, and *People v. Shum*, 117 Ill. 2d 317, 343 (1987)). If a man with a gun intended to kill someone, he could easily set up people to support a self-defense claim, which could be completed within minutes. Finally, defendant had a motive to fabricate his statement, since he attempted to use that statement in support of a self-defense claim. See *Williams*, 193 Ill. 2d at 352 (noting that " 'the presence or absence of self-interest' " is a factor to be considered in determining whether the spontaneous declaration exception is applicable (quoting *House*, 141 Ill. 2d at 382)). Examining the totality of the circumstances, we cannot say that the trial court abused

-21-

its discretion in barring this testimony.

¶ 83    Even if we find that Clayborn's statement should have been admitted, the error would not rise to the level of plain error. See *People v. Bradley*, 336 Ill. App. 3d 62, 66-67 (2002) (admission of evidence under "excited utterance" exception was not of such magnitude that it prevented defendant from receiving a fair trial and evidence was not closely balanced). Clayborn testified to essentially the same information as the objected-to statement when he testified that "[h]e said that someone was trying to shoot him" and "he said that someone was on the front"; defendant acknowledges as much in his reply brief. Additionally, defendant testified that he told Clayborn, " 'This guy in the front, he got a gun, man; he just told me he gonna kill me, man, just get me away from the area.' " Thus, defendant was permitted to present the same information as in Clayborn's first statement and inclusion of the statement would have had no effect on the result of this case.

¶ 84    Defendant also argues that the trial court abused its discretion when it prevented Simms from testifying to any statements that defendant made to her. Defendant argues that the statements he made to Simms were also spontaneous declarations. However, the content of Simms' testimony is not clear. Simms testified that defendant "asked could he eat," at which point the State objected. Simms later testified that defendant asked if he could come in, and the State again objected, leading to the trial court instructing Simms, "Ma'am, you can't testify as to anything that he told you." A statement concerning eating would not be a spontaneous declaration since it did not relate to the startling occurrence. However, Simms did not provide any further testimony about defendant's statements and defendant did not make an offer of proof as to her testimony, so it is not clear what the remainder of Simms' testimony would have been or whether it would have qualified under the spontaneous declaration exception. Based on the record before us, we cannot find that the trial court abused its discretion in sustaining the State's objections to Simms' testimony.

¶ 85    Defendant argues that the trial court failed to exercise its discretion when it instructed Simms not to testify to statements that defendant told her, which resulted in an abuse of discretion. We do not view the situation as a failure to exercise discretion, however. The State objected to Simms' testimony about defendant's statements three times. Each time, it was clear that the State was objecting on the basis of hearsay and the trial court sustained the objection. Additionally, the State objected an additional five times for various reasons, including hearsay objections, that the trial court overruled. By ruling on each objection, the trial court exercised its discretion and, as noted, we cannot find that it abused its discretion.

¶ 86    Moreover, even if Simms' testimony should have been admitted, the error would not have risen to the level of plain error because its absence did not tip the scales of justice against defendant. Simms was permitted to testify that defendant appeared scared, which corroborated defendant's theory that he feared the victim. Additionally, defendant testified that he ran to Simms' house and "asked her please let me come in the house 'cause somebody out there got a gun; he talking about he gonna kill me." Thus, defendant's comments to Simms were presented to the court. The evidence was not closely balanced and the absence of Simms' testimony did not have any effect on the result, thereby failing to rise to the level of plain error.

¶ 87    We find that even if Clayborn's testimony should have been admitted under the

-22-

spontaneous declaration exception to the hearsay rule, its absence did not rise to the level of plain error, nor did the trial court's decision not to permit Simms to testify to comments defendant made to her rise to the level of plain error. Accordingly, we affirm the trial court's decision.

¶ 88                                    Recollection of Evidence

¶ 89        Defendant's third argument on appeal is that he is entitled to a new trial because the trial court incorrectly recalled Suleiman's testimony and relied on that erroneous recollection in determining his credibility. Defendant acknowledges that he failed to object to the trial court's recollection of the testimony and did not raise the issue in his posttrial motion. He urges us to consider the issue despite any forfeiture because waiver should not bar review of a claim where the conduct of the trial court is at issue. Alternatively, defendant asks us to review the claim for plain error. Whether we consider the issue on the merits or through the lens of a plain error analysis, the first step is to determine whether error occurred. *Piatkowski*, 225 Ill. 2d at 565 ("the first step [in a plain error analysis] is to determine whether error occurred").

¶ 90        Defendant argues that the trial court denied him a fair trial by incorrectly recalling the testimony of Suleiman. When recounting the testimony of the witnesses prior to delivering the verdict, the court noted:

>      "Then the Court hears testimony from Mohammed Suleiman who was the store clerk there perhaps I guess you could call him one of the most independent witnesses there who testified similarly in the fact that he was sweeping the floor as he saw the victim ride up on his bicycle towards the store, *and thereafter the defendant got out and shot him several times and he did not see any gun pointed at the defendant and he did not see any gun whatsoever.* And after the shooting occurred, he escorted all the people in the store towards the back immediately and came back again and saw the car drive away and saw the victim dead." (Emphasis added.)

Defendant claims that the emphasized language was contrary to Suleiman's testimony and that the trial court erroneously believed that Suleiman witnessed the entire incident, including the shooting itself.

¶ 91        A trial court's failure to recall and consider testimony crucial to a defendant's defense may result in a denial of the defendant's due process rights. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). In a bench trial, the trial court is presumed to have considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record. *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). Where the record affirmatively indicates that the trial court did not remember or consider the crux of the defense when entering judgment, the defendant did not receive a fair trial. *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976).

¶ 92        Defendant analogizes his case to that in *Bowie*. In that case, the defendant was on trial for battery and resisting a police officer. *Bowie*, 36 Ill. App. 3d at 178. At trial, the defendant and the police officer both testified that the other initiated the altercation; as part of the defendant's testimony, the defendant testified that the police officer hit him on the

head and his head began bleeding. *Bowie*, 36 Ill. App. 3d at 179. During closing argument, defense counsel noted that the testimony of the police officer and the defendant was conflicting and noted that the defendant testified that he bled as a result of the police officer's blow. *Bowie*, 36 Ill. App. 3d at 179-80. The trial court interrupted, stating that there was nothing in the defendant's testimony indicating that he had been bleeding, and struck the argument. *Bowie*, 36 Ill. App. 3d at 180. The appellate court reversed the judgment of the trial court, holding that the record affirmatively indicated that the trial judge had forgotten the crux of the defense. *Bowie*, 36 Ill. App. 3d at 180.

¶ 93        However, *Bowie* is entirely distinguishable from the case at bar. Here, we cannot find that the record affirmatively demonstrates that the trial court incorrectly recalled Suleiman's testimony. Indeed, we note that after closing arguments and immediately prior to the court's findings, the parties directed the court's attention to the page of the trial transcript in which Suleiman testified that he took the store's customers to the back of the store. On the same page of the transcript, Suleiman testified that he turned his back to the victim to continue sweeping the rug, only turning back after shots had been fired. The trial court accepted the copy of the transcript and stated that it had reviewed the page. Thus, there is affirmative evidence that the trial court reviewed the testimony at issue immediately prior to making his ruling.

¶ 94        Additionally, the trial court's statements are not necessarily inconsistent with Suleiman's testimony. The language that defendant takes issue with is the trial court's statement that Suleiman observed the victim ride his bicycle toward the store "and thereafter the defendant got out and shot him several times and he did not see any gun pointed at the defendant and he did not see any gun whatsoever." There is no dispute that Suleiman actually testified that he observed the victim riding his bicycle, nor is there any question that during the time that Suleiman observed the scene, Suleiman never observed the victim with a gun. While Suleiman did not actually observe defendant exiting the vehicle, it was a reasonable inference made by the trial court based on Suleiman's testimony that the victim rode to within five feet of the passenger side of the vehicle in which defendant was sitting, Suleiman turned around for less than 10 seconds, heard shots, turned, observed the victim on the ground, and observed defendant running to the vehicle. See *Berland*, 74 Ill. 2d at 305-06 (the finder of fact has the responsibility to determine the credibility and weight of witness testimony, to resolve conflicts and inconsistencies present therein, and to draw reasonable inferences from the evidence). The fact that defendant exited Clayborn's vehicle and shot the victim is also not at issue in the case; defendant admits that he did so.

¶ 95        Defendant argues that the trial court incorrectly recalled the testimony because the quoted language implies that Suleiman observed the shooting itself and observed the absence of a weapon in the victim's possession during the shooting. Defendant further argues that this incorrect recollection goes to the crux of defendant's theory of self-defense, in which defendant argued that the victim was pointing a gun at him at the time of the shooting. We disagree. While it is possible to read the trial court's statement in that way, it is not the only way to do so. As noted, it is possible to read the statement as recounting Suleiman's testimony and drawing an inference from that testimony.

¶ 96        Moreover, the trial court's decision that defendant was not credible was not based

solely on Suleiman's testimony. The court did state that it found Suleiman's testimony compelling:

> "But perhaps the most compelling of all witnesses, the State [*sic*] finds is the independent witness Mr. Mohammed Suleiman, someone detached from everybody here who disputes the defendant's testimony who shows that what occurred [happened] because the defendant wanted to do so and not in any self-defense situation."

However, there were three other witnesses who observed the shooting itself, and the trial court also summarized their testimony prior to reaching its verdict. The court further noted that there was no gun recovered at the scene and no evidence that anyone took a gun belonging to the victim from the scene. The court finally pointed to inconsistencies in defendant's testimony. We cannot find the trial court improperly recalled Suleiman's testimony and there was other testimony to support the trial court's verdict, so we find no error and affirm the trial court's decision.

¶ 97                                           Rule 412

¶ 98        Defendant's final argument on appeal is that the State violated Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) when it failed to disclose Jackson's prior felony convictions in a timely manner and used perjured testimony when it failed to correct Jackson's misstatement of his criminal history. During defense counsel's re-cross-examination of Jackson, Jackson testified that he did not have any felony convictions. The State objected to defense counsel's question, engaging in the following colloquy:

> "STATE: Judge, we spoke with Counsel prior to the witness testifying regarding his background. We agreed with Counsel and I thought we were in agreement with this that we were going to look into his background. There is a question as to whether he has a felony conviction or not.
>
> We don't believe he does, but we told Counsel we would look into it. So until we look into it, I would object to the question because it's our position that he does not have an adult felony conviction.
>
> THE COURT: Do you have anything to support a felony conviction? I will allow you lee way [*sic*] to Cross Examine if you know what he's got, Mr. Vance. If you don't know what he's got, don't set the–
>
> STATE: There's no good faith basis.
>
> DEFENSE: What they tendered me today, it's a disposition of guilty on unlawful possession of a weapon by a felon. That's what it has right there.
>
> STATE: May I see that, Counsel? These are also juvenile arrests, counsel.
>
> DEFENSE: I have nothing further."

¶ 99        Rule 412 is a codification of the due process requirements espoused in the United States Supreme Court case of *Brady v. Maryland*, 373 U.S. 83 (1963). *People v. Sharrod*, 271 Ill. App. 3d 684, 688 (1995) (Rule 412(c) is a codification of the *Brady* requirements); *People v. Redmond*, 146 Ill. App. 3d 259, 263 (1986) (Rules 412(a)(vi) and 415(b) impose

a continuing duty on the State to disclose relevant criminal records of its witnesses against the accused, which is a codification of the requirements of due process under *Brady*); *People v. Tonkin*, 142 Ill. App. 3d 802, 804-05 (1986) (Rule 412(a)(vi) is a codification of *Brady*'s due process requirements). Rule 412(a)(vi) provides that the State must, on written motion of defense counsel, disclose "any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at the hearing or trial." Similarly, Rule 412(c) requires that "the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce his punishment therefor." Information that may cast doubt on the credibility of a witness for the State tends to negate the guilt of the accused and must be disclosed. *Sharrod*, 271 Ill. App. 3d at 688 (citing *People v. Preatty*, 256 Ill. App. 3d 579 (1994)). "Among the information which the State must disclose is evidence with potential impeachment value such as prior convictions, probationary status, pending criminal charges, and juvenile adjudications." *Sharrod*, 271 Ill. App. 3d at 688 (citing *People v. Redmond*, 146 Ill. App. 3d 259, 263 (1986)).

¶ 100　　To establish a *Brady* violation, the undisclosed evidence must be both favorable to the accused and material. *People v. Barrow*, 195 Ill. 2d 506, 534 (2001). Evidence is material " ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " *Barrow*, 195 Ill. 2d at 534 (quoting *People v. Coleman*, 183 Ill. 2d 366, 393 (1998), quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability is "a 'probability sufficient to undermine confidence in the outcome.' " *People v. Hobley*, 182 Ill. 2d 404, 433 (1998) (quoting *Bagley*, 473 U.S. at 682).

¶ 101　　In the case at bar, defendant claims that the State failed to timely disclose Jackson's criminal record. Defendant claims that Jackson had at least two felony convictions that were not disclosed: one for unlawful possession of a weapon by a felon and a second that formed the basis of the unlawful possession conviction. However, as the State points out, the evidence as to Jackson's criminal record does not appear in the record on appeal. The sole reference to any prior criminal history is contained in the trial transcript. The transcript indicates that the State tendered defense counsel an unnamed document indicating "a disposition of guilty on unlawful possession of a weapon by a felon." After looking at the unnamed document, the State observed that "[t]hese are also juvenile arrests" and stated that it was the State's position "that [Jackson] does not have an adult felony conviction." The defense has not shown anything in the record to indicate that there were any adult felony convictions. The defense wants us to speculate that the unnamed document which is not in the record that stated "a disposition of guilty on unlawful possession of a weapon by a felon" is a determination that Jackson was found guilty of unlawful possession of a weapon by a felon as an adult. The State claimed this was a juvenile violation. We have nothing before us in which to make any determination. Accordingly, our analysis on any *Brady* violation is limited to, at most, two juvenile adjudications.

¶ 102　　A witness's juvenile adjudications can be used for impeachment in appropriate circumstances, and such information must also be disclosed. See 705 ILCS 405/5-150(1)(c) (West 2004) ("Evidence and adjudications in proceedings under [the Juvenile Court Act of

1987] shall be admissible: *** in criminal proceedings in which anyone who has been adjudicated delinquent *** is to be a witness including the minor or defendant if he or she testifies, and then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials ***."); *People v. Newborn*, 379 Ill. App. 3d 240, 248 (2008); *Sharrod*, 271 Ill. App. 3d at 688; *Redmond*, 146 Ill. App. 3d at 263.

¶ 103    However, we find that, even if Jackson had two juvenile adjudications that would have been admissible as impeachment evidence, any failure by the State to disclose them to defendant would not amount to a *Brady* violation because the adjudications were not material. The existing case law demonstrates that there are two primary ways in which to determine whether reversal is warranted: (1) by applying the materiality element of the *Brady* requirement (see *Barrow*, 195 Ill. 2d at 537) or (2) by examining whether the defendant was prejudiced by the discovery violation (see *People v. Blackman*, 359 Ill. App. 3d 1013, 1018 (2005)). Since evidence that is material under *Brady* necessarily involves a reasonable probability that the outcome of the case would be different, the defendant would be prejudiced in the event of a true *Brady* violation. Thus, we focus our analysis on the materiality element to determine whether reversal is warranted.

¶ 104    First, even if untimely, information about Jackson's adjudications *was* disclosed to defendant during the trial. The State indicated that it had spoken with defense counsel prior to Jackson's testimony about the possibility of Jackson having a felony conviction and the State tendered a document to defense counsel containing at least the information about the juvenile adjudications. Defense counsel could have requested a continuance in order to further investigate Jackson's criminal record or to prepare an effective cross-examination, but did not do so. While the State retained the burden of disclosing the information to the defense, defense counsel's inaction emphasizes the lack of importance the information had on the outcome of the trial. See *People v. Foster*, 76 Ill. 2d 365, 384 (1979) ("Defense counsel knew of [the witness's] statement before he took the stand. If that statement was so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose before [the witness] testified. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial."); see also *People v. Eyler*, 133 Ill. 2d 173, 221-22 (1989).

¶ 105    Additionally, we find the cases that defendant relies on to be distinguishable. Both *People v. Godina*, 223 Ill. App. 3d 205 (1991), and *People v. Tonkin*, 142 Ill. App. 3d 802 (1986), concerned the discovery of the State's nondisclosure after the trial had ended. Thus, there was no opportunity for a continuance to remedy any prejudice. Here, however, a continuance would have allowed defendant time to further investigate Jackson's background and make any changes to his cross-examination as a result. Moreover, in *Tonkin*, the undisclosed prior conviction belonged to the victim in a rape case in which the defendant raised a consent defense. *Tonkin*, 142 Ill. App. 3d at 803, 805. Here, on the other hand, Jackson was one of four witnesses to the shooting and provided testimony that was largely consistent with that of the other witnesses. Even if his testimony had been completely discredited, there still would have been three witnesses to the shooting, as well as forensic evidence.

¶ 106    In the case at bar, Jackson's criminal record was not material because there is not a

reasonable probability that, had it been disclosed, the outcome of the proceeding would have been different. Defendant admitted to shooting the victim and the only question was whether he did so in self-defense. As noted, Jackson was one of four witnesses to testify to the circumstances of the shooting. None of the four witnesses observed the victim with a gun, and all four testified that defendant exited a vehicle in order to shoot the victim, who arrived at the scene on a bicycle. Additionally, there was forensic evidence indicating that the victim had been shot in the back. Finally, defendant testified that the victim pointed a gun at him at the scene of the shooting, at which point defendant shot the victim; the trial court found defendant's testimony to be incredible. Even if Jackson had been completely absent from the trial, the evidence against defendant was overwhelming. See *Barrow*, 195 Ill. 2d at 537 (finding no reasonable probability that outcome would have been different since evidence of defendant's guilt was overwhelming). Therefore, we must conclude that there is no reasonable probability that, even if Jackson's criminal record had been properly disclosed, the result of defendant's trial would have been different.

¶ 107    Similarly, we must reject defendant's related argument that the State's failure to correct Jackson's testimony that he did not have any felony convictions was tantamount to a knowing use of perjured testimony. A State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process. *Olinger*, 176 Ill. 2d at 345 (citing *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995)). This same rule applies where the State does not solicit the false testimony but allows it to go uncorrected. *Olinger*, 176 Ill. 2d at 345 (citing *Napue v. Illinois*, 360 U.S. 264 (1959), and *People v. McKinney*, 31 Ill. 2d 246, 251 (1964)).

¶ 108    In the case at bar, defense counsel asked Jackson whether he had any felony convictions, and Jackson replied that he did not. The State then objected, discussing its agreement with defense counsel that the State would investigate Jackson's criminal record but that, until it did so, its position was that Jackson did not have any adult felony convictions. The question of Jackson's criminal history was not revisited.

¶ 109    Despite defendant's contention, we cannot find that Jackson provided "false testimony" that the State failed to correct. First, there is no evidence that Jackson had any "felony convictions." As noted, Jackson's criminal history is not included as part of the record on appeal, and our only information concerning it indicates that Jackson had at least two juvenile adjudications. A juvenile adjudication is not necessarily analogous to a felony conviction. See, *e.g.*, *People v. Taylor*, 221 Ill. 2d 157, 163-64 (2006) (holding that for the purpose of the escape statute, a juvenile adjudication was not a felony conviction). Moreover, immediately after Jackson's response, the State objected and stated its position that Jackson had no adult felony convictions. We cannot find that this conduct warrants reversal, especially given our conclusion above that any omission of Jackson's criminal history had no affect on the trial.

¶ 110    Finally, defendant argues that, to the extent that his trial counsel forfeited any claim concerning the failure to disclose Jackson's criminal history by failing to request a continuance or investigate further into Jackson's criminal history, trial counsel was ineffective. The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the

two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 102 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 111 Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance.

¶ 112 To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 113 In the case at bar, the second prong of *Strickland* cannot be satisfied because defendant suffered no prejudice. As we noted, there were a number of eyewitnesses to the shooting, all of whom testified that they did not observe the victim with a weapon. There was also the presence of forensic evidence that the victim had been shot in the back, as well as defendant's incredible account of the event. Any failure on trial counsel's part concerning Jackson did not prejudice defendant's case. Therefore, we affirm the trial court's decision.

¶ 114 CONCLUSION

¶ 115 For the foregoing reasons, we affirm defendant's conviction. We find that: (1) the trial court did not err in finding defendant guilty of first degree murder rather than second degree murder, (2) the trial court did not err in barring evidence of the victim's violent acts and any error in its decision to preclude testimony concerning defendant's statements did not rise to the level of plain error, (3) the trial court did not rely on an erroneous recollection of Suleiman's testimony, and (4) any failure by the State to disclose Jackson's criminal record was not reversible error.

¶ 116 Affirmed.